UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LANCE MEADORS | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 18-1007-BAJ-EWD |
| | * | |
| ANTONIO P. D'AGOSTINO, BUCHANAN HAULING AND RIGGING, INC., NATIONAL INTERSTATE INSURANCE COMPANY AND XYZ INSURANCE COMPANY | * * * * | **JURY TRIAL** |

* * * * * * * * * * * * * * * * *

**MEMORANDUM IN SUPPORT OF
MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. JEFFREY LEWINE
AND EVIDENCE OR TESTIMONY CONCERNING DIFFUSION TENSOR IMAGING**

MAY IT PLEASE THE COURT:

Defendants, **Antonio P. D'Agostino**, **Buchanan Hauling and Rigging, Inc.** and **National Interstate Insurance Company**, submit this Memorandum in Support of their Motion *in Limine* to Exclude Testimony of Dr. Jeffrey Lewine and Evidence or Testimony Concerning Diffusion Tensor Imaging. Plaintiff has named Dr. Lewine as an expert who intends to provide his expert opinion as to his analyses of Plaintiff's diffusion tensor imaging MRI. Defendants move the Court for an Order excluding Dr. Lewine's testimony as well as any testimony or evidence concerning diffusion tensor imaging ("DTI") studies of Plaintiff, **Lance Meadors**. The Court should not allow these studies to be used by Plaintiff, Dr. Lewine or anyone else to diagnose Plaintiff with a traumatic brain injury ("TBI") as a result of this accident. The Court should not allow any witness to rely upon such studies in forming any opinion or testimony. This testimony is irrelevant and unreliable: it will not assist the trier of fact, is not based upon sufficient facts, is not the product of reliable principles and methods and has not been reliably

1

applied to the facts of this case. Accordingly, the Court should grant this Motion and exclude the testimony of Dr. Lewine and any evidence of or testimony concerning DTI, especially its alleged use in diagnosing TBI.

I.     **Facts & Background:**

Plaintiff claims he suffered injury in an October 22, 2018 accident involving Mr. D'Agostino. Please see Plaintiff's Original Complaint, Doc. 1, paragraphs 3 and 10. While the Complaint does not state the date of the accident, the date is not in dispute. Plaintiff claims Mr. D'Agostino caused the accident. *Id.*, paragraph 9. Defendants have stipulated Mr. D'Agostino was acting in the course and scope of his employment as an employee of Buchanan Hauling and Rigging, Inc. at the time of the accident. Docs. 6; 15-1; 15-2.

As a result of the accident, Plaintiff claims he "suffered severe bodily injuries to his head" and other areas of his body. Doc. 1, paragraph 10. Following the collision, Acadian Ambulance was dispatched to the scene. Please see records of Acadian Ambulance, attached as **Exhibit A**. Plaintiff's chief complaint was lower back pain. *Id.* His neurological assessment showed he had "normal" "mental status." *Id.* His head and neck were normal. *Id.* His Glasgow Coma Score was 15 – normal – both times it was checked. *Id.* The records make clear Plaintiff was "only experiencing lower back pain" at the scene. *Id.*

Acadian Ambulance took Plaintiff to Our Lady of the Lake's emergency department. There he reported no loss of consciousness, and he denied head or neck pain. Please see relevant portions of records of Our Lady of the Lake, attached as **Exhibit B**. However, since this time Plaintiff's story has changed, and he has complained of loss of consciousness and head trauma, even though the records from the date of the accident explicitly state otherwise.

On March 15, 2019, Plaintiff submitted to an MRI of the brain. Please see March 15,

2

2019 records of Doctors Imaging, attached as **Exhibit C**. The MRI of the brain was negative. *Id.* The MRI notes a "DTI acquisition" was also obtained, and "a separate quantitative DTI report along with a NeuroQuant volumetric analysis will be rendered at a later date by Edward L. Soll, M.D." *Id.* However, there is no report from Dr. Soll in the record or in the Doctors Imaging records, and Dr. Soll is not listed in Plaintiff's Rule 26 Initial Disclosures, discovery responses or expert disclosures.

On December 9, 2019, Plaintiff provided Defendants with his Supplemental Rule 26 Expert Disclosures. Please see Plaintiff's Supplemental Rule 26 Expert Disclosures, attached as **Exhibit D**. Plaintiff's initial Expert Disclosures are the same as those found in Exhibit D except Dr. Lewine was apparently inadvertently left off the initial expert disclosures, forwarded on October 4, 2019. In the supplemental disclosures, Plaintiff identified Dr. Jeffrey Lewine, Ph.D., as a testifying expert. *Id.* Plaintiff represented Dr. Lewine will provide his "expert opinion as to his analysis of Plaintiff's MRI and diffusion tensor imaging." *Id.*

Dr. Lewine provided a report, dated March 22, 2019, summarizing his opinions. Please see Dr. Lewine's report, attached as **Exhibit E**. He noted the DTI analyses were "abnormal." *Id.* He found abnormalities in 11 "fiber tract regions" showing "high FA values."[1] *Id.* These abnormal fiber tracts "normally support" a non-specific "range of visual, auditory, motor and cognitive functions including memory and emotional processing." *Id.* <u>Dr. Lewine does not state, however, the "abnormal" DTI findings were, more probably than not, caused by the accident.</u> Confusingly, Dr. Lewine opines the abnormal DTI observations "could" be the result of mild TBI. *Id.* He does not state the DTI more likely than not indicates Plaintiff suffered a TBI.

---

[1] DTI in general is not easily explained in layman's terms. Dr. Lewine testified DTI is "an advanced type of MRI." Exhibit F, p. 15, lines 8-11. It measures "the movement of waters in the extracellular space in between the axons." *Id.* at lines 14-17. The DTI measures what are called something called "FA," which "is a measure of how much the direction of motion for the water is restricted. *Id.*, p. 17, lines 12-16. Dr. Lewine believes Plaintiff's DTI shows he has "high FA values" in "11 fiber tracts." Exhibit E.

Traumatic brain injury, he states, is one "possibility," of what, the report is not clear. *Id.* Dr. Lewine then states additional information is needed to "further clarify the etiology of his current clinical status." *Id.*

Dr. Lewine's deposition took place on February 28, 2020. Dr. Lewine admitted he is not a neuroradiologist, radiologist, or any other kind of medical doctor. Please see deposition of Dr. Lewine, attached as **Exhibit F**, p. 5, lines 9-18. Nor is he a neuropsychologist or psychologist. *Id.* He is not licensed or Board-certified in any state. *Id.* at lines 19-22. No medical doctor signed off on his report. *Id.*, p. 8, lines 1-4. Dr. Lewine admitted he never saw or spoke with Plaintiff. *Id.*, p. 21, lines 20-22. However, he confirmed his report is a complete summary of his opinions and the basis for those opinions. *Id.*, p. 21, line 23 – p. 22, line 1.

In coming to his complete opinions, Dr. Lewine testified he did not review any medical records of Plaintiff predating the accident. Exhibit F, p. 23, lines 1-4. He did not review Plaintiff's employment or educational records. *Id.* at lines 5-8. He did not review any deposition testimony in this case. *Id.* at lines 15-17. He was not aware of any records showing prior head trauma to Plaintiff. *Id.* at lines 18-20. He did not review any records concerning any criminal history of Plaintiff. *Id.*, p. 23, line 23 – p. 24, line 1. Dr. Lewine admitted the only information in his possession when he issued his report was the imaging brain scans from Doctors Imaging. *Id.*, p. 6, lines 8-12. As noted above, the Doctors Imaging records suggest Dr. Soll would issue a report, but the only person in this matter to review the DTI scan was Dr. Lewine, not Dr. Soll.

Since his report was issued, Dr. Lewine testified he has reviewed various records. He reviewed the neuropsychological testing of Dr. Susan Andrews, the ambulance records and the report of Dr. Anne Foundas, a neurologist. Exhibit F, p. 6, line 13 – p. 7, line 2. However, Dr. Lewine testified he has no intention of supplementing or updating his report, and these records

4

do not change any of the opinions in his March 22, 2019 report. *Id.*, p. 7, lines 3-14.

As noted above, Dr. Lewine's report is a complete summary of his opinions, and he has no intention of updating it. Thus, by his own account, the DTI "could" show evidence of a TBI, as opposed to more likely than not showing evidence of a TBI. A TBI is only a possibility based upon Dr. Lewine's analysis, but he needs more information to clarify the cause of Plaintiff's "current clinical status," but Dr. Lewine admits he does not have this additional information. Defendants submit both this testimony and Dr. Lewine's findings fail all four requirements of Federal Rule of Evidence 702 and the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Because Dr. Lewine's testimony and the DTI results and interpretation in general will not assist the trier of fact, are not based upon sufficient facts, are not the product of reliable principles and have not been reliably applied to the facts of this case, the Court should grant this Motion.

**II.    Law & Argument:**

    **A.    Plaintiff cannot satisfy his burden pursuant to Rule 702 and *Daubert* to show Dr. Lewine's opinions and the DTI analysis are relevant and reliable.**

The Court should grant this Motion and exclude the testimony of Dr. Lewine and the DTI analysis as a whole because they are not relevant and not reliable. When expert testimony is challenged, the burden of proof rests with the party seeking to present the testimony. *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Smith Tank & Steel, Inc.*, 3:11-CV-00830, 2014 WL 5794952, at *2 (M.D. La. Nov. 6, 2014), citing, *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269 (5th Cir. 1998). Federal Rule of Evidence 702 states a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the

5

trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court held trial courts must determine whether expert testimony under Rule 702 is "not only relevant, but reliable." 113 S.Ct. 2786, 2795. The Court must exercise this control because "[e]xpert evidence can be both powerful and quite misleading," *Daubert*, 113 S.Ct. at 2798.

In conducting this analysis, this Court should evaluate whether Dr. Lewine "possesses the requisite qualification to render opinion on a particular subject matter." *Turner v. Brunk*, CV 15-286-SDD-RLB, 2016 WL 11190298, at *1 (M.D. La. Dec. 6, 2016). If the Court finds Dr. Lewine is not qualified to testify concerning a diagnosis of traumatic brain injury on the basis of a DTI analysis, the Court must exclude this testimony. If, however, the Court finds Dr. Lewine so qualified, the Court must ask if the opinions are reliable and relevant. *Daubert*, 113 S.Ct. 2786, 2795-2796. Dr. Lewine's testimony and DTI analysis is relevant if it assists the trier of fact in understanding the evidence or determining a fact in issue. *Daubert*, 113 S.Ct. 2786, 2795-2796. Another aspect of relevancy is whether the proffered expert testimony is sufficiently tied to the facts of the case as to it will aid the jury in resolving a factual dispute. *Id.*, quoting, *United States v. Downing,* 753 F.2d 1224, 1242 (3rd Cir. 1985).

In determining if Dr. Lewine's testimony is reliable, the Court must consider the extent to which it can be tested, whether it is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of Dr. Lewine's findings and technique, and, finally, whether the method has been generally accepted in the relevant scientific community. *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). While

6

these factors are not mandatory or exclusive, and the Court must decide whether the factors discussed in *Daubert* are appropriate, the existence of sufficient facts and a reliable methodology is "in all instances mandatory." *Id.* The overarching goal of this analysis is to ensure Dr. Lewine, whether basing his testimony on professional studies or personal experience, "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *In the Matter of M&M Wireline & Offshore Servs.*, LLC, 15-5338, 2017 WL 430063, at *3 (E.D. La. Jan. 31, 2017).

Plaintiff must show Dr. Lewine is sufficiently qualified and his testimony is reliable by a preponderance of the evidence. *Id.* at 2796. Plaintiff cannot, however, simply rely on Dr. Lewine's self-serving assurances he utilized generally accepted scientific methodology. testimony. *Louisiana Health Care Self Ins. Fund v. United States*, CIV.A. 12-766, 2014 WL 4828940, at *3 (M.D. La. Sept. 29, 2014), quoting, *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir.1998).

Of course, the Court may exclude the testimony of Dr. Lewine and the DTI analysis if the Court finds its probative value is substantially outweighed by the likelihood it will cause unfair prejudice or confuse or mislead the jury. Fed. R. Evid. 403.

Dr. Lewine's testimony and any reliance upon the DTI analysis are irrelevant and unreliable pursuant to Rule 702 and *Daubert*, and they are misleading and will confuse the jury pursuant to Rule 403. As such, the Court should grant this Motion and exclude this evidence and testimony.

### B. Dr. Lewine's testimony and the DTI analysis will confuse and mislead the jury.

Before even addressing the more detailed analysis of Rule 702 and *Daubert*, the Court should grant this Motion on the basis of Rule 403 because Dr. Lewine's testimony and the DTI

7

analysis will confuse and mislead the jury. Most strikingly, Dr. Lewine candidly admitted he cannot say the DTI analysis, showing "11 abnormally high FA value tracts," was more likely than not caused by the accident.

The test for determining the causal relationship between the alleged accident and subsequent injury is whether Plaintiff proves through medical testimony his injuries or condition were, more probable than not, caused by the accident. *Bordenave v. Delta Air Lines, Inc.*, CV 18-00637, 2020 WL 377017, at *2 (M.D. La. Jan. 23, 2020). Dr. Lewine admits he cannot testify the DTI findings were more likely than not caused by the accident. His deposition contains the following:

> Q. Is it possible to tell, more likely than not, based on the basis of DTI, whether or not these 11 abnormally high FA value tracts were caused by the accident?
>
> A. Again, not based on the DTI in isolation.

Exhibit F, p. 63, lines 14-18.

Dr. Lewine, who is admittedly not a medical doctor, who did not rely on medical reports of medical doctors in formulating his opinion, whose report was not reviewed by a medical doctor, whose report was not relied upon by any medical doctor in this case (as will be addressed below), who is incompetent to render a medical opinion or diagnosis and whose sole function in this litigation is to analyze the DTI and state whether it suggests Plaintiff suffered a TBI, *by his own admission*, cannot say Plaintiff suffered a TBI based on the DTI analysis. His testimony is therefore useless to the jury. Allowing Dr. Lewine to testify before a jury from his ivory tower can only serve to mislead and confuse the jury. The jury will believe his testimony must have some relevance because he would not otherwise appear at trial if it did not. The jury will believe

his testimony must be important because it is dressed in a "neuroscientific perspective." Yet, Dr. Lewine has already testified his opinion does not rise to the "more likely than not" standard. Because his opinion does not meet the medical causation standard, it is irrelevant and must be excluded. Allowing him to testify will confuse and mislead the jury. The Court should exclude this testimony pursuant to Rule 403.

**C.     Dr. Lewine is not qualified to testify the DTI analysis is evidence of a TBI.**

As noted above, Dr. Lewine flatly admitted the DTI analysis does not more likely than not support a finding Plaintiff suffered a TBI in the accident. However, Dr. Lewine attempts to skirt the edges of providing a medical diagnosis. Despite the facts (1) he is not a medical doctor, (2) cannot provide a medical diagnosis, opinion or report, (3) no doctors signed off on or relied upon his report in rendering opinions for future care of Plaintiff and (4) his repeated attempt to claim he is not making a "diagnosis," Dr. Lewine essentially provides a medical diagnosis.

"Diagnosis" has been described as a classification scheme, or a "pre-existing set of categories agreed upon by the medical profession to designate a specific condition." *Improving Diagnosis in Health Care*, Committee on Diagnostic Error in Health Care; Board on Health Care Services; Institute of Medicine; The National Academies of Sciences, Engineering, and Medicine; Balogh EP, Miller BT, Ball JR, eds., National Academies Press (US); 12/29/15. As Dr. Lewine's report and deposition testimony show, he is attempting to classify Plaintiff as a person with a TBI based upon the DTI analysis then imply Plaintiff suffers from medical conditions as a result. He tries to wiggle out of this fact by claiming his opinions are based on a "neuroscientific perspective" and tries to limit the term "medical diagnosis" to a diagnosis intended to provide recommendations for future care, but the bottom line is he intends to provide testimony the DTI analysis proves Plaintiff suffered a TBI and has downstream negative effects.

9

Even if Dr. Lewine was qualified to render this medical diagnosis, his deposition testimony does not satisfy the standard of proving medical causation. As noted above, his report states the DTI observations "could" be the result of mild TBI. Exhibit E. Traumatic brain injury, he states, is one "possibility," but additional information is needed to "further clarify the etiology of his current clinical status." *Id.* The volumetric findings in his report "do not explicitly support the presence of mild TBI, [but] they also do not strong weigh against the possibility" Plaintiff has a TBI. *Id.* One cannot, he testified, read a DTI and provide a finding a particular patient has a TBI. Exhibit F, p. 29, lines 6-9. A doctor would need more information, information Dr. Lewine admitted he does not have. *Id.* Dr. Lewine, even if he was capable of rendering a diagnosis, cannot do so based upon his own admission.

Even doctors who had more information do not cite or rely upon Dr. Lewine's findings. None of Plaintiff's doctors rely on the DTI or Dr. Lewine's report. Only one, Dr. Susan Andrews, Plaintiff's own neuropsychologist, even reviewed it. Please see relevant portions of the deposition of Dr. Andrews wherein she stated she "reviewed" the DTI report but declines to state she relied upon it, attached as **Exhibit G**. The lone report of Dr. Foundas, Plaintiff's neurologist, took place before Dr. Lewine's report was issued, so she cannot have relied upon the DTI analysis.

In his deposition, Dr. Lewine says, from one side of his mouth, the DTI findings "could" be the result of mile TBI, a mere "possibility." Out of the other side of his mouth he attempts to relate functional deficits Plaintiff may have with the DTI findings. Exhibit F, pp. 51-62. Then he testified the "links" between abnormally high FA values and patient functionality "are general," not specific. *Id.*, p. 51, lines 8-12. One is left wondering exactly what the DTI adds to this matter, considering Plaintiff will present testimony from a neurospsychologist *and* a neurologist, neither

10

of whom use it in their treatment and recommendations to Plaintiff.

Dr. Lewine is not qualified to give a medical diagnosis, and the Court should exclude any testimony from Dr. Lewine stating the DTI analysis supports a finding of a TBI. Dr. Lewine's opinion "from a neuroscientific perspective" is a medical diagnosis in masquerade. Even if he was capable of providing a medical diagnosis, his testimony is clear he cannot do so, and the Court should exclude his testimony and findings.

### D. Dr. Lewine's testimony and the DTI analysis fails the first two prongs or rule 702 and the relevance test set forth in *Daubert*.

Dr. Lewine's testimony and the DTI analysis will not assist the trier of fact, are not based upon sufficient facts and are not "tied to" the facts of this matter. As such, they do not survive Rule 702 and *Daubert* scrutiny.

Defendants submit Dr. Lewine's testimony cannot possibly assist the trier of fact in this matter. His testimony, as he admits, fails to reach the "more probably than not standard." He testified his findings "could" show evidence of a TBI, a "possibility" about which additional information is needed to "further clarify the etiology" of Plaintiff's current clinical status." He admitted he does not have this additional information, and the additional information he did receive did not change his opinion, summarized in this paragraph. He admitted his findings "do not explicitly support the presence of mild TBI, [but] they also do not strong weigh against the possibility" Plaintiff has a TBI. Further, his findings are relied upon by a total of zero medical doctors treating Plaintiff. There is no way this testimony could assist the trier of fact.

Further, Dr. Lewine's testimony cannot be considered "tied to" the facts of this case. As noted above multiple times, Dr. Lewine simply had no facts about this case other than a normal brain MRI and the inherently unreliable DTI. Dr. Lewine admitted he never met with Plaintiff. He did not review prior medical records or employment information of Plaintiff. Had he done so,

11

he might have learned Plaintiff was the victim of prior head trauma when he was hit in the face with a combination lock while in jail in August, 2011. Please see relevant portions of records of Lallie Kemp Medical Center, attached as **Exhibit H**. Dr. Lewine was not aware of Plaintiff's prior head trauma. Exhibit F, p. 23, lines 18-22. Dr. Lewine testified head trauma can cause high FA values. *Id.*, p. 27, lines 14-16. Dr. Lewine did not have this information for his consideration. Thus his report and opinions are incomplete.

Dr. Lewine did not have information concerning Plaintiff's past drug use for his consideration. For instance, Plaintiff was fired from his job in December, 2008 for violation of the company's substance abuse policy. Please see December, 2008 record from MMR Construction, attached as **Exhibit I**. On March 23, 2010 and July 22, 2011 he was charged with operating a "clandestine" methamphetamine lab. Please see criminal filings, attached *in globo* as **Exhibit J**. On July 15, 2010, he was charged with possession of methamphetamine, Adderall and Xanax and entered a plea of "no contest." *Id.* On April 9, 2014, he filed a Petition in a domestic matter and admitted he "had problems in the past" but was at the time drug free. Please see April 9, 2014 filing, attached as **Exhibit K**. These are public record. While the possession and operation of a drug lab charges are not direct evidence of drug use (they are evidence he was in very close proximity to drugs, obviously), the admission to having problems in the past and being then-drug free is an admission of past drug use. If Plaintiff was in fact using methamphetamine, it is a known neurotoxin. See, e.g., Shaerzadeh, F., Streit, W.J., Heysieattalab, S. et al. Methamphetamine neurotoxicity, microglia, and neuroinflammation. J Neuroinflammation 15, 341 (2018). https://doi.org/10.1186/s12974-018-1385-0

Dr. Lewine was not in possession of this information when he rendered his report. In arriving at his opinions, Dr. Lewine compared Plaintiff to a "neurotypical" control group who

did not have a history of substance abuse or prior history of head trauma. Exhibit F, p. 22, lines 6-13. This control group was the basis for Dr. Lewine's finding Plaintiff's DTI analysis was abnormal in the first place. *Id.*, p. 35, lines 5-11. The very foundation of Dr. Lewine's opinion is based upon insufficient information and is not tied to the facts of this case. Common sense dictates Plaintiff's DTI findings, if they have any use at all, in litigation or otherwise, should be compared to a peer group of similar individuals when asked to determine if the accident caused the findings of the DTI. This did not happen, and Dr. Lewine's analysis is not tied to the facts of Plaintiff or this case. For this reason and because his opinion will not assist the trier of fact, the Court should exclude Dr. Lewine's testimony and the DTI analysis because they are not relevant pursuant to Rule 702 and *Daubert*.

>   E.   **Dr. Lewine's testimony and his DTI analysis fail the second two prongs of Rule 702 and the reliability test of *Daubert*.**

The *Daubert* Court observed:

> [A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." "[T]he statements constituting a scientific explanation must be capable of empirical test."

113 S.Ct. 2786, 2795-2796. (internal citations omitted)

Further, the Court noted "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 113 S.Ct. at 2796. Dr. Lewine's testimony and the use of DTI as an indicator of TBI fail this test.

Dr. Lewine concedes DTI in certain respects does not have robust support. For example, Dr. Lewine testified DTI is not a reliable predictor of patient outcomes. Exhibit F, p. 38, line 21

13

– p. 39, line 10. In fact, he testified "more severe" TBI cases involving *low* FA values have been associated with poor outcomes, but Plaintiff has high FA values. *Id.* But Dr. Lewine admitted he could not point to peer-reviewed studies in this regard. *Id.*

Dr. Lewine offered the following evidentiary paradox: if a person has strong evidence of an "actual" TBI, a DTI evaluation shows abnormality in only about 60% of those people tested, but even if a DTI showed normal findings, there could still be a TBI in the patient. Exhibit F, p. 45, lines 11-16; p. 46, lines 3-9. Note the referenced sections technically discuss the volumetric findings of Dr. Lewine's report, but Dr. Lewine conceded DTI suffers from a similar sensitivity issue. *Id.*, p. 45, lines 23-25.

Not only does Dr. Lewine's testimony seemingly contradict itself, but a review of the prevailing literature concerning TBI shows Dr. Lewine's testimony is not supported by his peers. Dr. Lewine does not cite *any* literature of studies in his report or deposition. He does not note the DTI literature deals overwhelmingly in TBI injury groups showing lower FA values, not high FA values like Plaintiff allegedly has. See, e.g., Hulkower, M.B., et al., *A Decade of DTI in Traumatic Brain Injury: Ten Years and 100 Articles Later*, American Journal of Neuroradiology, Jan. 2013; http://www.ajnr.org/content/34/11/2064. He does not note the American Journal of Neuroradiology "has not arrived at a consensus view of the value of DTI in head trauma. Nonspecific patters or findings with DTI prohibit the confirmation or diagnosis of mild TBI with reliability." See, Meltzer, C.C., et al., *Guidelines for the Ethical Use of Neuroimages in Medical Testimony: Report of a Multidisciplinary Consensus Conference*, American Journal of Neuroradiology, April, 2014; http://www.ajnr.org/content/35/4/632. He ignores the fact that as of 2015, there was "insufficient evidence … to conclude that these advanced techniques [including TBI] can be used for routine clinical use at the individual patient level." Wintermark, M., et al,

*Imaging Evidence and Recommendations for Traumatic Brain Injury: Advanced Neuro- and Neurovascular Imaging Techniques*, American Journal of Neuroradiology, Feb. 2014; http://www.ajnr.org/content/36/2/E1. He ignores the more recent, November, 2018 statement of the International Journal of Law and Psychiatry:

> DTI, however, is somewhat nonspecific, and it is not known whether disruptions in FA or MD are the result of disturbances in axonal membranes, myelin sheaths, microtubules, neurofilaments, or other factors. Importantly, many of the [DTI] measures described above are just beginning to be applied to investigate brain injuries in mild TBI and thus this area is a relatively new frontier for exploration.

Shenton, M.E., et al., Mild traumatic brain injury: Is DTI ready for the courtroom? International Journal of Law and Psychiatry, Nov. 2018; https://www.ncbi.nlm.nih.gov/pubmed/30391039.

Dr. Lewine cites no authority for his findings because the authority does not support his theories. They are not the product of reliable principles and methods and cannot be reliably applied to the facts because the science does not allow DTI principles to be applied to the facts in the way Dr. Lewine asserts. Dr. Lewine's testimony and the DTI analysis do not satisfy the third and fourth prongs of Rule 702 or the *Daubert* reliability standard, and the Court should grant this Motion.

**III.    Conclusion:**

Dr. Lewine's testimony and DTI findings are irrelevant and unreliable pursuant to *Daubert*. They will not assist the trier of fact, are not based upon sufficient facts, are not the product of reliable principles and methods and have not been reliably applied to the facts of this case. As such, the Court should grant this Motion and exclude this testimony and evidence.

Respectfully submitted,

/s/ *Nathan M. Gaudet*

GUY D. PERRIER, #20323
gperrier@perrierlacoste.com
NATHAN M. GAUDET, #30514
ngaudet@perrierlacoste.com
Perrier & Lacoste, LLC
365 Canal Street, Suite 2550
New Orleans, LA  70130
Telephone:   (504) 212-8820
Facsimile:    (504) 212-8825

**CERTIFICATE OF SERVICE**

I hereby certify the foregoing pleading has been delivered to all counsel of record, either through the CM/ECF system, e-mail, depositing a copy of same in the United States mail, first class postage prepaid, by hand delivery or by facsimile transmission, this 6th day of March, 2020, at their last known address of record.

/s/ *Nathan M. Gaudet*

NATHAN M. GAUDET