UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA


LANCE MEADORS,

            PLAINTIFF,

 -vs-                                NO: 18-1007-BAJ-EWD

ANTONIO P. D'AGOSTINO, BUCHANAN
HAULING AND RIGGING, INC., NATIONAL
INTERSTATE INSURANCE COMPANY AND XYZ
INSURANCE COMPANY,

            DEFENDANTS.

        DEPOSITION OF DR. JEFFREY LEWINE

            FEBRUARY 28, 2020
                10:17 a.m.
        1101 Yale Boulevard Northeast
            LARGE CONFERENCE ROOM
        Albuquerque, New Mexico 87106


        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, this DEPOSITION was:


TAKEN BY:  NATHAN M. GAUDET, ESQ.
            ATTORNEY FOR DEFENDANTS


REPORTED BY:  KENDRA K.SUTTON
              RPR, CCR 131
              MAGNA LEGAL SERVICES
              1635 Market Street, 9th Floor
              Philadelphia, Pennsylvania 19103




EXHIBIT F

Page 2

```
 1            APPEARANCES
 2   For the PLAINTIFF:
 3      EGENBERG, APLC
        650 Poydras Street
 4      Suite 2525
        New Orleans, Louisiana 70130
 5      (504) 229-5700
        zackory@egenberg.com
 6      BY: ZACKORY WOOD, ESQ.
 7   For the DEFENDANTS:
 8      PERRIER & LACOSTE, L.L.C.
        One Canal Place
 9      365 Canal Street
        Suite 2550
10      New Orleans, Louisiana 70130
        (504) 212-8820
11      ngaudet@perrierlacoste.com
        BY: NATHAN M. GAUDET, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          JEFFREY LEWINE, Ph.D.
 2   EXAMINATION BY              PAGE
 3
        MR. GAUDET            4
 4
 5   WITNESS SIGNATURE/CORRECTION PAGE    78
     CERTIFICATE OF REPORTER        79
 6
 7
 8
 9
10
11          EXHIBIT INDEX
12   EXHIBIT      DESCRIPTION      PAGE
13   Exhibit 1    CURRICULUM VITAE      77
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          JEFFREY LEWINE, Ph.D.
 2   after having been first duly sworn under oath, was
 3       questioned and testified as follows:
 4            EXAMINATION
 5   BY MR. GAUDET:
 6      Q.   Good morning, Doctor, appreciate you being
 7   with us.  I know we've met before, but just for the
 8   record, my name is Nathan Gaudet.  I'm a defense
 9   attorney representing multiple parties in a lawsuit
10   filed by an individual name Lance Meadors who, I
11   believe, you evaluated?
12      A.   Yes.
13      Q.   And knowing this is not your first
14   deposition, we'll dive right in without some of the
15   ground rules, and things of that nature.  Just safe
16   to say, you do understand you're under oath as if
17   you're in front a judge and jury, correct?
18      A.   Yes, sir.
19      Q.   Did you happen to bring a copy of your
20   updated C.V.?
21      A.   I did not.  I can get you one before we
22   go.
23      Q.   Okay.  Or, you know, after, just in case
24   we go a little long.  And if that would include the
25   case list, I would certainly appreciate it.  So the
```

Page 5

```
 1   gentleman you evaluated, Lance Meadors, was in a
 2   motor vehicle on October 22nd, 2018.  And we
 3   received your report from MINDSET and an MRI from
 4   Doctors Imaging dated March 15th, 2019.  And, so,
 5   those are really the -- that's kind of the balance
 6   of the records we're going to be talking about.  I
 7   assume you have those with you?
 8      A.   Yes.
 9      Q.   Okay.  Thank you.  All right.  Just for a
10   little background for the record, you are a
11   neuroscientist, correct?
12      A.   That's correct.
13      Q.   And, so, not a medical doctor?
14      A.   That is correct.
15      Q.   And not a radiologist or neurologist,
16   psychologist, and, therefore, not a neuroradiologist
17   or neuropsychologist, correct?
18      A.   That is correct.
19      Q.   Are you licensed or board certified in any
20   states?
21      A.   There is no licensing or board
22   certification for neuroscientists.
23      Q.   Okay.  Thank you.  Do you rely, in issuing
24   your report or in general -- I guess in this case,
25   specifically, do you rely on the opinions of any
```



2 (Pages 2 to 5)

EXHIBIT F

Page 6

1  medical doctors of the specialties I just listed?
2      A.  So when that information is available, I
3  do take that information into account and integrate
4  that in forming my neuroscientific opinions.
5      Q.  Okay.  And in this particular instance
6  with Mr. Meadors, did you rely on those -- those
7  folks in issuing your report or findings?
8      A.  So, at the time that the report itself was
9  issued, the only information that I had was the
10  neuroradiology read.
11      Q.  Okay.  And that was the Doctors Imaging?
12      A.  Yes.
13      Q.  And since that time, have you come into
14  more records?
15      A.  Yes.  So I do have a record on subsequent
16  neuropsychological testing.
17      Q.  Is that by Dr. Foundas?
18  (Note: Reporter clarification.)
19      Q.  (By Mr. Gaudet) F-O-U-N-D-A-S.
20      A.  This is from Dr. Andrews.
21      Q.  Okay.  Sure.
22      A.  And then I also have a copy of the -- the
23  ambulance record.
24      Q.  Okay.  And that was from the date of the
25  accident, correct?

Page 7

1      A.  Yes.  And -- hang on -- and I do have the
2  report from Dr. Foundas, as well.
3      Q.  Okay.  And in what way did you -- well,
4  let me ask you this:  Have you issued an updated
5  report since you've come into possession of those
6  records?
7      A.  I have not, no.
8      Q.  And is it your intention to do so?
9      A.  I have not been asked to do so by
10  Plaintiff's counsel.
11      Q.  In your review of those records, do they
12  change any of your opinions in your report -- which,
13  for the record, is dated March 22nd, 2019?
14      A.  No, they do not change any of my opinions.
15      Q.  Okay.  Did you review any of the raw data
16  from Dr. Andrews or Dr. Foundas?
17      A.  No, sir.
18      Q.  Is that something you typically do or
19  don't do?  Does that impact your report in any way?
20      A.  So, neuropsychological data can -- raw
21  data can really only be sent to another
22  neuropsychologist, so I do not, routinely, have raw
23  data there.  For Dr. Foundas' report, she puts in
24  sufficient detail that there really isn't raw data
25  for me to -- to look at, from her report.

Page 8

1      Q.  Okay.  Did any of those doctors in this
2  case sign-off on your report, if that's even
3  necessary?
4      A.  It is not necessary, and they did not.  I
5  believe that Dr. Andrews saw my report.  I'm not
6  certain whether Dr. Foundas had seen it or not.
7      Q.  Okay.  Have you ever been disqualified
8  from testifying before any court?
9      A.  No, sir.
10      Q.  Has your testimony ever been limited in
11  your -- to your knowledge?
12      A.  So, in one of the very first capital cases
13  that I was involved in, there was some genetics
14  testing that had been done and, at the last minute,
15  they asked me to talk about the genetics.  And it
16  was determined, rightly so, that I was not
17  sufficiently an expert to talk about that material,
18  so that was limited.
19      Q.  And that would have been a criminal --
20      A.  That was a criminal case, yes, sir.
21      Q.  Have you ever testified in the US Middle
22  District of Louisiana?
23      A.  No, sir.
24      Q.  Have you ever testified in court in a
25  civil matter?

Page 9

1      A.  So, I did -- so all of my prior civil
2  cases, up until a week and a half ago, had all been
3  settled.  I testified in federal court about two
4  weeks ago.
5      Q.  Where was that?
6      A.  In Austin.
7      Q.  Austin, Texas?
8      A.  Yes, sir.
9      Q.  Do you recall the name of that case, by
10  any chance?
11      A.  The plaintiff is Jerry Schmidt, and it's
12  against the U.S. Government.
13      Q.  Is that like a Social Security type of
14  deal, or --
15      A.  No, it was a -- it was a motor vehicle
16  accident where the other vehicle was being driven --
17      Q.  Post office worker, or something?
18      A.  -- by a service member.
19      Q.  Okay.  Got you.  Have you ever been the
20  subject of a Motion in Limine or Daubert motion, to
21  your knowledge?
22      A.  So, there have been a number of attempted
23  Motion in Limine -- again, all of those cases
24  actually settled prior to doing a formal Daubert.
25  In the criminal cases, there have been 702




EXHIBIT F

Page 10

1  challenges, and I have been admitted for my
2  testimony in all of those cases.
3    Q.   Okay.  Do you happen to know Judge Brian
4  Jackson?
5    A.   Not that I know of.
6    Q.   How about Magistrate Judge Aaron Wilder
7  Doomes -- D-O-O-M-E-S?
8    A.   I do not recognize the name, no, sir.
9    Q.   What percentage of your patients are
10 involved in civil litigation -- I'm not worried
11 about the criminal side -- and if I'm using the word
12 "patients" wrong, correct me?
13   A.   So -- so, "patient" would imply a medical
14 context.
15   Q.   Got you, understood.
16   A.   We're not dealing with those.  So I do
17 data analysis evaluations that are kind of not
18 related, necessarily, to civil work.  And, then, the
19 civil work and capital work is about 50/50.  The
20 legal stuff, altogether, takes about 30 to 40% of my
21 effort.
22   Q.   Does that include criminal, as well?
23   A.   Yes.
24   Q.   Okay.  Do you have a feel for what
25 percentage of that 30 or 40% is civil versus

Page 11

1  criminal?
2    A.   It's about 50/50.
3    Q.   I'm sorry, you just said that.  Sorry
4  about that.  And of that 50% of the 30 or 40%, what
5  percentage of those evaluees, I suppose, are done at
6  the request of a plaintiff's attorney?
7    A.   So the majority of them are for plaintiff.
8  At this point, I would say 5% for defense.
9    Q.   Okay.  All right.  Thank you.  Have you
10 ever had any other cases with Plaintiff's counsel in
11 this case, Mr. Bradley Egenberg, or his firm?
12   A.   Not to the best of my knowledge.
13   Q.   I believe a subpoena was issued for your
14 record in this case.  In that instance, would the
15 subpoena response include any handwritten notes or
16 e-mails you may have?
17   A.   So, I don't recall on this particular
18 case.  I think we were subpoenaed for the files.  I
19 don't recall being subpoenaed for e-mails on this
20 case, although there's only two or three, that are
21 mostly on scheduling issues.
22   Q.   Okay.  If I remember correctly -- and I
23 don't want to get too bogged down on this particular
24 issue -- you are an employee of -- Lovelace?
25   A.   I'm an employee of Lovelace.  I'm also an

Page 12

1  independent contractor.
2    Q.   Okay.  And your services for this case --
3  I guess, they're the same for any civil litigation
4  case, but let's stick to this case -- you were paid
5  by the hour as an employee of Lovelace; is that
6  correct?
7    A.   No.  For this case, no, I'm -- I am a
8  consultant to MINDSET, so I am paid by MINDSET.  And
9  there is a flat rate for the initial analysis of the
10 MRI data and, then, hourly for things like
11 deposition.
12   Q.   Do you know how these charges are set?  Do
13 you have any say in that?
14   A.   So -- so there's two -- there's what I
15 charge MINDSET and, then, there's what MINDSET
16 charges outside of that, which has overhead.
17   Q.   Sure.
18   A.   And, so, I don't know about that.  My
19 charge to MINDSET for the initial analysis was
20 somewhere between 700 and $875, and -- I'd have to
21 check it, it depends on a couple of things -- and,
22 then, my charge for deposition is at 350 an hour.
23   Q.   Okay.  Does this office -- or do you give
24 attorney discounts for any of your services?
25   A.   I do not.

Page 13

1    Q.   Do you accept private insurance, just in
2  general?
3    A.   I do not, no.
4    Q.   Okay.  If you have a patient that is
5  treating with whatever, MINDSET or Lovelace, not in
6  litigation, do you -- does -- do you -- how does
7  that work, if they pay private insurance, you charge
8  the same fee?
9    A.   Yeah, I'm -- yeah.  So I'm completely
10 independent of how MINDSET gets -- gets the money.
11   Q.   Okay.  Do you have any contracts with any
12 medical funding companies?
13   A.   I do not, no.
14   Q.   Do you know if MINDSET or Lovelace does?
15   A.   I believe -- so, MINDSET, I believe, does
16 and -- I'm not 100% sure of the definition of
17 "medical funding company," but if you're referring
18 to companies that support plaintiff cases -- is
19 that --
20   Q.   Yeah, right.
21   A.   Yes.  So I don't know the current -- what
22 the current state of the contract is, but there is
23 one group that we have -- that MINDSET has been
24 working with.
25   Q.   And are you an owner or director or board



EXHIBIT F

Page 14

1     member, or whatever, in either MINDSET or Lovelace?
2         A.    No, sir.
3         Q.    Okay.  Do you have your own LLC?
4         A.    I actually do have a -- an LLC that's
5     developing therapies for autism and tinnitus.
6         Q.    That's separate from your litigation?
7         A.    That's completely separate, yes.
8         Q.    And, hopefully, we won't get too bogged
9     down, but let's start talking about some
10    neuroscience, okay?
11        A.    Okay.
12        Q.    Okay.  So I remember, from talking to you
13    before, you gave us some literature and, certainly,
14    the last case, you had the PowerPoints and
15    everything, and that was very illuminating.  We're,
16    obviously, talking about the brain here and billions
17    of cells that make up the brain.
18        A.    Yes, sir.
19        Q.    They send signals that encode, transmit
20    information along neurons, correct?
21        A.    Yes, sir.
22        Q.    And in this case, what we're really
23    dealing with are axons that are part of the neurons,
24    and those connect different parts of the brain?
25        A.    Yes, sir.

Page 15

1         Q.    And the -- an MRI -- just regular MRI --
2     will, kind of, take a picture of the brain, correct?
3         A.    It reconstructs an image of the brain,
4     yes, sir.
5         Q.    So that's like an anatomy, or structural,
6     type of image?
7         A.    Yes, sir.
8         Q.    And diffuse tensor imaging -- what people
9     call DTI -- is another layer on top of a regular
10    MRI; is that a fair, of --
11        A.    It's an advanced type of MRI, yes.
12        Q.    And, then, the DTI measures the movement
13    of water along the axons, would that be correct?
14        A.    Yes.  So it's measuring the movement of
15    waters in the extracellular space in between the
16    axons, it's direction of movement is restricted by
17    the axons.
18        Q.    Okay.  And, so, DTI is not -- is not an
19    anatomical viewing?
20        A.    It is an anatomical viewing.  So the --
21    the picture that a regular MRI takes is also based
22    on water content.
23        Q.    Okay.
24        A.    So everything comes down to hydrogen atoms
25    and so, it's -- it's a different way of analyzing

Page 16

1     the data.  But the DTI image is still a -- is,
2     ultimately, considered to be a structural image, as
3     opposed to a functional image, something like
4     functional MRI.
5         Q.    Okay.  And there's been -- to your
6     knowledge, there's been the DTI MRI and, I believe,
7     just a regular MRI of this particular patient?
8         A.    Yes, sir.
9         Q.    No other FMRIs, or anything?
10        A.    To the best of my knowledge, there has not
11    been a functional MRI, that is correct.
12        Q.    Okay.  And a DTI basically helps you --
13    gives you an idea of how well the axons are
14    transmitting the information, right?
15        A.    It doesn't tell you about how well they're
16    transmitting information, it tells you about their
17    structural integrity.
18        Q.    Okay.  Which may or may not correlate with
19    the transmission of --
20        A.    Which is going to have an impact on
21    function, but it doesn't directly measure function.
22        Q.    Okay.  All right.  Let's see -- and I
23    remember from last time, kind of what we deal
24    with -- or at least in cases like this, as far as I
25    can tell, with DTI imaging, are what are called FA

Page 17

1     values?
2         A.    Yes.
3         Q.    And those describe how the water diffuses
4     along the tracts adjacent to the axons, and my
5     understanding is that they're given a value.  0 is
6     closer to not working properly, 1 is closer to kind
7     of what -- what -- working properly, what you want
8     in a neurotypical brain?
9         A.    No, that's not an accurate
10    characterization.
11        Q.    Okay.
12        A.    So FA is a measure of how much the
13    direction of motion for the water is restricted.  So
14    a value of 0 means it goes in all directions
15    equally.  A value of 1 means it can go in only a
16    single restricted direction.
17        Q.    And you want it to be more restricted?
18        A.    Well, to a point.  So -- so, in general,
19    axons travel in tracts, and that will cause
20    restriction.  But if you look at -- in a
21    neurotypical control subject, for example, if you
22    look at the corpus colosseum, which interconnect the
23    two halves of the brain, it is the most structured
24    of tracts.  The FA value there is on the order of
25    .7.  Okay?



MAGNA
LEGAL SERVICES

Page 18

1    So, an FA value of .9, or an FA value of
2 .5, both of those would be abnormal. One would be
3 abnormally low, one would be abnormally high, but
4 they're still both abnormal. So there are things --
5 there's pathophysiology that can happen, which
6 causes tracts -- FA values to be too high. And, in
7 fact, in this particular case, what we have is
8 predominately high values, but that is still an
9 indication of abnormality. It is not an indication
10 that everything is super-fine.
11    Q.  Got you. And, you said pathophysiology --
12    A.  Pathophysiology.
13    Q.  -- pathophysiology. What -- when you say
14 that, are you are you referring to something that
15 can cause an abnormally high FA value, such as
16 trauma, whatever else is listed in your report?
17    A.  Yes, sir.
18    Q.  Let's see. Just in this case, "Failure of
19 axonal pruning, or disease/injury related" --
20 (Note: Reporter clarification.)
21    Q.  (By Mr. Gaudet) "Failure of axonal
22 pruning, or disease/injury related intracellular
23 cytogenic edema," and then just inflammation, and
24 things like that.
25    A.  Yes, sir.

Page 19

1    Q.  And trauma would be one of those, as well?
2    A.  So -- yes. So trauma causes -- can cause
3 those things.
4    Q.  What else can cause those things?
5    A.  So -- so, again -- so -- so this issue of
6 axonal pruning, that's a developmental issue. So,
7 if the -- if there are too many fibers -- more
8 fibers than there should be, that could give you
9 abnormally high FA values. Intra- -- intracellular
10 edema can be caused by head trauma. We know that
11 there are certain psychiatric diseases that are
12 associated with both high or low FA values in
13 particular regions.
14    And, then, neuro-inflammation is one of
15 the ones that can, depending on stated -- the level
16 it's at, can cause either very high FA values or
17 very low FA values.
18    Q.  And in turn, what can cause
19 neuro-inflammation?
20    A.  Trauma is a trigger. Other disease
21 process, stroke, things like that.
22    Q.  Okay. Can -- can chronic drug use cause
23 neuro-inflammation, or high FA values?
24    A.  So, chronic drug use, in general, has been
25 more typically associated with low FA values. I do

Page 20

1 not know of any reports in the literature on high FA
2 from chronic drug use. There may be isolated
3 reports out there that I'm just not familiar with.
4    Q.  And, specifically, when you're talking
5 about drug use, methamphetamine use, can that cause
6 high FA values?
7    A.  Again, to the best of my knowledge,
8 methamphetamine has only been associated with low
9 FA.
10    Q.  Okay. All right. So these FA values are,
11 you know, when someone like me looks at them, it's
12 really just a number and, I guess, on a -- a DTI
13 review, it's also, really, a number, but you have to
14 compare those numbers to something?
15    A.  Yes, sir.
16    Q.  And my understanding is, you use, quote,
17 automated computational methods and employ a
18 statistical comparison of the patient's data
19 compared to a neurotypical control group, correct?
20    A.  Correct.
21    Q.  And we discussed the control group a
22 little bit in the report -- again, dated
23 March 22nd -- and let me back up for a second.
24 Foundationally -- on the report, the report says the
25 date of the exam March 15th, 2019 -- did you

Page 21

1 actually see Mr. Meadors in person?
2    A.  No. So these -- the data were collected
3 at Doctors Imaging and were transferred --
4 transferred to us.
5    Q.  Okay. And the -- the imaging took place
6 at Doctors Imaging in Metairie, Louisiana?
7    A.  Yes.
8    Q.  And, obviously, Mr. Meadors was there in
9 person for that?
10    A.  Yes, sir.
11    Q.  And do you know who spoke with him to get
12 his, you know, self-reported background, and things
13 of that nature?
14    A.  In this particular case, I am not sure.
15 It's usually one of the technologists. It had been
16 a fellow by the name of David Robinson who was doing
17 most of them. I -- David left, and I'm not -- it
18 was around this time and, so, I'm not sure whether
19 it was David or someone else.
20    Q.  Okay. So -- but you've never spoken to
21 him or seen him -- "him" being Mr. Meadors?
22    A.  That is correct.
23    Q.  And, so, in this report, this report is
24 a -- can I call this report a "complete summary of
25 your opinions and the basis therefore"?



EXHIBIT F

Page 22

1    A.   Yes, sir.
2    Q.   Okay.  And -- okay.  We'll get back to the
3  report, a little bit later, more specifically, but
4  as far as the -- the control group, what do we mean
5  when we say "neurotypical"?
6    A.   Excuse me.  So a neurotypical group is a
7  group of individuals who do not report to us that
8  they have any developmental issues; autism,
9  dyslexia, anything you like that.  They do not have
10  a history of substance abuse or alcohol abuse.  They
11  do not have any diagnosed neurological or
12  psychiatric conditions.  They don't have any prior
13  history of traumatic brain injury.
14    Q.   Okay.  And, so, in this case, the findings
15  of Mr. Meadors is -- a DTI was compared to a group
16  of neurotypical folks or a group of his peers that
17  may have a prior history of brain injury or drug use
18  or developmental issues?
19    A.   So he's compared to a neurotypical group.
20  So the overall database is just over a thousand
21  subjects.  We pull, from that database, all of the
22  gender and age range match subjects -- so within 10
23  years of age.  So, in his case, it looks like there
24  was 106 valid data sets for the volumetric
25  evaluation and 104 for the FA evaluation.

Page 23

1    Q.   Okay.  And you did not review any medical
2  records of Mr. Meadors that predate the
3  October 22nd, 2018, accident, correct?
4    A.   That is correct, yes.
5    Q.   Okay.  And you did not review any -- any
6  records showing employment or educational, you know,
7  attainment -- or records of Mr. Meadors?
8    A.   Not at the time the report was prepared.
9  There's a little bit of that information in
10  Dr. Andrews' report, which I have subsequently seen.
11    Q.   Got you.  And, again, Andrews' report did
12  not -- doesn't change your opinion on your -- your
13  findings?
14    A.   That is correct.
15    Q.   Did you review any deposition testimony of
16  Plaintiff, or otherwise?
17    A.   No, sir.
18    Q.   Are you aware of any records showing any
19  prior head trauma of Mr. Meadors?
20    A.   I am not aware of any records, but, again,
21  I haven't done a -- full review of records in this
22  case.
23    Q.   Okay.  And are you -- have you reviewed
24  any records of any criminal history that Mr. Meadors
25  may have?

Page 24

1    A.   No, sir.
2    Q.   Okay.  If -- if it turns out that
3  Mr. Meadors had a prior head trauma -- I don't know
4  that necessarily -- diagnosed as a TBI, would
5  matter -- but if he had a prior head trauma and a
6  history of drug use, would that impact your findings
7  and, if so, how?
8    A.   So -- so we ask the question in two
9  levels; the first level is, are things normal or
10  abnormal, and that is a straightforward, very
11  objective, "yes," "no" type of question.  And, so,
12  none of the other prior history matters there, it's
13  either normal or abnormal.
14    Q.   Okay.  So -- sorry to interrupt you.  When
15  you say you ask if things are normal or abnormal,
16  what are you asking about specifically?
17    A.   So, are the FA values in the individual
18  tracts -- and we actually did volumetrics on him,
19  didn't see anything there -- so we ask, for each of
20  these regions, are these things within normal
21  limits.  And that's the first part of the question.
22         If the answer is, there are things that
23  are atypical, the second part of the question, then,
24  is, what are the most likely causes of the injury.
25  And in this particular case, we only got to that

Page 25

1  second question very superficially.  So we didn't
2  have any records at the time that this was done, so
3  what I can say is that the information in the report
4  is consistent with a traumatic brain injury.  But in
5  order to determine the -- the most likely cause of
6  those abnormalities, the data need to be reviewed
7  within the entire context of the client's history,
8  and at the time that this was done, I have only very
9  limited context.  So what I can say, with high --
10  very high confidence, is that things were
11  abnormal --
12    Q.   Okay.
13    A.   -- here.  Based on the very limited
14  information that I presently have, I believe the
15  traumatic brain injury is the most likely origin of
16  what I see, but I don't know that full history.
17  And there, certainly, are things I could -- may
18  become revealed in his history that might change
19  that opinion.
20    Q.   Okay.  And, so, I'm glad you got into that
21  because that was, certainly, an area I wanted to ask
22  about.  A DTI, like any other MRI, is really a
23  moment in time basically?
24    A.   Yes, sir.
25    Q.   Based on the findings of the DTI itself,



EXHIBIT F

Page 26

1  is it possible to tell the cause of those findings
2  in the DTI?
3      A.   So -- so, again, one can, based on
4  history, make a reasonable, more likely than not,
5  this is the cause.  Now, if you tell me that there's
6  25 prior head traumas, all with persistent symptoms,
7  I am not able to tell you which one of those is the
8  most likely cause -- or if you tell me there's a
9  history of, you know, schizophrenia or other disease
10 process.  So I can't -- I can't date those with 100%
11 confidence.  Depending on what the actual data are,
12 what the literature says about the profiles, I may
13 be able to give you a "more likely than not" it was
14 related to a particular event.
15     Q.   If I gave you just a DTI MRI and said,
16 "Here you go, Doctor," and you looked at it and
17 said, "There's X amount of FA values that are high
18 and X amount that are low," there's no way to look
19 at just that and say, "Well, this looks likes it's
20 caused by trauma, this looks like it's caused by
21 drug use," or -- et cetera?
22     A.   So I would never use it as a stand-alone
23 technique.  There are certain patterns, just from
24 the -- the DTI head trauma versus developmental
25 disorder, versus something else, might rise a little

Page 27

1  bit to the top --
2      Q.   Sure.
3      A.   -- but I always want to know the entire
4  history before making that type of determination.
5      Q.   Okay.  Is -- are -- are conditions, such
6  as dyslexia -- would that be considered a
7  neurological finding that could impact an FA value?
8      A.   That would be a developmental condition
9  that could potentially impact FA values, yes.
10     Q.   Which way does it impact FA values?
11     A.   Again, most conditions typically impact FA
12 values to be low.
13     Q.   Okay.  All right.
14     A.   Head trauma's one of the exceptions, where
15 we see some people have very low values, we actually
16 see other people have very high values.
17     Q.   Okay.  And just so we're clear, there's
18 no -- there's no prior MRIs, DTI or otherwise, that
19 you reviewed of this patient?
20     A.   Not that were made available to me.
21     Q.   I don't know if there are any.  I'm not
22 trying to trick you, I'm just making sure.  Did
23 anyone else comment on -- so, obviously, you didn't
24 do the imaging, and --
25     A.   That is correct.

Page 28

1      Q.   -- and whoever -- whoever read that
2  particular imaging is Dr. Soll -- S-O-L-L -- was the
3  interpreting radiologist there.  Has anyone
4  commented, or read, or provided information for your
5  report in your findings, outside of the DTI reading
6  from Dr. Soll?
7      A.   No.
8      Q.   Okay.
9      A.   And, actually, I think the scan was
10 actually read by Dr. Sylvestri -- Dr. Soll does the
11 summary report -- I don't have it in front of me.
12     Q.   Yeah, either way.  Okay.  That's fine.
13 One or the other, or both, maybe.  Can you render a
14 diagnosis based on the findings of a DTI?
15     A.   So, again, I'm not a physician, so I never
16 render a diagnosis.  Diagnosis is not part of what I
17 talk about.  And, again, as a stand-alone
18 technique --
19     Q.   When you say it's a "stand-alone" --
20     A.   No, "as a stand-alone" technique, you
21 would -- I certainly would not render a, you know,
22 opinion on etiology, we have to have all the other
23 information.
24     Q.   Okay.  And when you say "etiology," is
25 that --

Page 29

1      A.   Cause.
2      Q.   Okay.  Can a DTI reliably diagnosis -- I
3  guess not diagnosis -- could a DTI give you an idea
4  of the cause of traumatic -- scratch that.  I'm
5  trying to think of the best way to ask this
6  question.  Can a -- can you read a DTI and come up
7  with a finding that a particular patient had a
8  traumatic brain injury?
9      A.   So, again, not in isolation.  There are,
10 potentially, things within a DTI examination that
11 would make me particularly concerned about traumatic
12 brain injury, but, you know, it always has to be
13 viewed within the actual clinical history and
14 profile.  So there's nothing unique in a DTI
15 examination that says traumatic brain injury is the
16 only possibility.
17     Q.   Okay.  Let's look at your report.  In the
18 background, from self-reported notes -- I assume
19 that means it was reported by Mr. Meadors himself?
20     A.   Yeah, on a questionnaire from Doctors
21 Imaging that was then relayed to me.
22     Q.   Okay.  And there's a self-report loss of
23 consciousness for 10 to 20 minutes, correct?
24     A.   Yes, sir.
25     Q.   And did you review -- you said you



EXHIBIT F

Page 30

1  reviewed the ambulance records.  Did you review the
2  records of the emergency room?
3    A.  So, I have not -- so all that I have are
4  these initial -- initial records, and it looks, to
5  me -- and, again, I didn't have these at the time I
6  did this report, so I only had his-self report.
7  Based on the records that are here, it kind of
8  suggests that there was kind of a fading in and out
9  of consciousness.  It's not clear, to me, that there
10 was a full loss of consciousness for 10 or 20
11 minutes, but I don't have the full records at this
12 point.
13    Q.  Is there any objective sign of head trauma
14 of this particular person?
15    MR. WOOD:  Object to form.
16    A.  So -- so, again, in the -- again, in the
17 very limited notes that I have -- the ambulance
18 notes, that is not called out specifically.  One
19 doesn't need to have outward signs to have traumatic
20 brain injury.  So I -- so it's one of those things
21 where if it's positive, then the skull is clearly
22 crushed or something, and you got good evidence --
23 when data are lacking, that doesn't bias me, one way
24 or another, to say there's not a traumatic brain
25 injury because you can get it even without any head

Page 31

1  contact against an object.
2    Q.  (By Mr. Gaudet) Got you.  And he also
3  self-reported other symptoms such as headaches,
4  visual difficulties, memory problems, change of
5  personality, sleeplessness, depression, fatigue,
6  correct?
7    A.  Yes, sir.
8    Q.  Okay.  So the -- all right.  The -- as far
9  as the technical stuff goes with these DTIs, they
10 are -- they use a more powerful magnet than a
11 regular MRI scanner, correct?
12    A.  So -- so they -- so this was done on a 3.0
13 Tesla scanner.
14 (Note:  Reporter clarification.)
15    A.  3.0 Tesla Scanner.  Most university
16 hospitals have 3.0 Tesla scanners at the moment.
17 Community hospitals, more typically, will have a 1.5
18 Tesla scanner.
19    Q.  Okay.  So 3 is better than 1.5?
20    A.  It's a more powerful, it gives you better
21 signal to noise.
22    Q.  Got you.  And you said "better signal with
23 less noise"?
24    A.  Signature to noise.  The signal is higher
25 and the background noise is less.

Page 32

1    Q.  Okay.  So, you know, there's a discussion,
2  like we said, earlier, of the control group, the 106
3  match control data sets were identified and --
4  those are, I believe -- then they're further divided
5  up into, like, male for Mr. Meadors?
6    A.  The overall data set is a thousand.
7  There's 106 males that are within 10 years of his
8  age range.
9    Q.  Okay.  And that was the control group for
10 this particular analysis?
11    A.  For the statistical analysis, yes, sir.
12    Q.  Okay.  And those 106 individuals in the
13 control group also had DTI with a 3.0 Tesla?
14    A.  On our machine here -- so they were all
15 scanned on the machine here at -- excuse me, Mind
16 Research Network.  We have calibrated and done what
17 are known as "scaling scans" --
18    Q.  Okay.
19    A.  -- on people evaluated here and at the
20 Doctors Imaging scanner.  And that's what allows us
21 to do a valid comparison of somebody scanned in
22 Louisiana relative to our normative database.
23    Q.  Okay.  So it's not actually the same --
24 the same machine itself?
25    A.  Correct.

Page 33

1    Q.  It may be the same brand or whatever -- I
2  don't know how that works -- not the same magnet,
3  but you guys calibrate the coils the same way?
4    A.  Yes.
5    Q.  And do you know who's responsible for
6  doing that?
7    A.  So I actually went --
8    Q.  You, personally?
9    A.  -- and did the calibration evaluations,
10 yes.
11    Q.  Okay.  Was there any standard for the
12 specific number of controls in this case, or were
13 those 106 all that were available?
14    A.  It's all that's available within the
15 database.
16    Q.  I'm sorry, so the 106 is for the
17 volumetrics --
18    A.  -- it's 104 for the --
19    Q.  Okay.  Got you.  Just to clarify that, the
20 volumetric, you controlled for some false positives,
21 and found that none of Mr. Meadors' brain regions
22 showed abnormal brain volume?
23    A.  So, from a -- from a purely statistical
24 perspective, the data did not indicate any of the
25 107 brain regions that have abnormal volume, that's



MAGNA
LEGAL SERVICES

EXHIBIT F

Page 34

1  correct.
2      Q.   And, then, of the 104 for the FA
3  evaluation, the control group data set, do you know
4  if any of those people were smokers?
5      A.   So there are some smokers that are
6  included, and we've actually -- so there are
7  publications at looking at smoking for DTI. Most of
8  the publications suggest that it makes the DTI value
9  slightly small. There's a couple -- one, maybe
10 two -- publications that show that the DTI values
11 can actually be a little bit higher. Impacts that
12 are much, much smaller than what we are seeing here.
13 We've actually looked at the question and, in our
14 data sets, comparing smokers and non-smokers, we
15 actually have seen a reduction in FA on the order of
16 only 1%, so not sufficient to explain any of the
17 things we are seeing here.
18     Q.   The -- the reduction of FA was 1%, or 1%
19 of the data set of smokers had a reduction?
20     A.   No. So, if you -- if you average across
21 all the smokers and compare them with non-smokers,
22 the reduction FA is on the order of 1%.
23     Q.   Okay. And, as we said, earlier, of the --
24 the control data set, they were without history of
25 neurological or psychiatric disease or injury,

Page 35

1  without history of TBI, without history of substance
2  abuse, without history of learning disability or
3  developmental disability; is that right?
4      A.   Correct.
5      Q.   Would your findings, or opinion, change if
6  you found out that Mr. Meadors was -- was not
7  without all those things, like the control group he
8  was being compared to?
9      A.   So, again, that -- that goes to the second
10 part of the question. So normal versus abnormal is
11 comparison with a neurotypical control group. As
12 to -- as to cause of the abnormalities -- again,
13 knowing that information -- having additional
14 information would help me do a better job on
15 identifying causality -- I'd need to know the
16 details there. So there are some things that might
17 be in the history that might have no impact. There
18 might be things in the history that would make me
19 say, "Oh, yeah, that's a possibility." And -- and,
20 again -- so, at this point, I have only very, very
21 limited history. Based on the very limited history
22 I currently have, traumatic brain injury, in my
23 opinion, is the most likely cause of what we're
24 seeing, but my historical information is limited.
25     Q.   Okay. And whenever you received the DTI

Page 36

1  MRI, you already knew that Mr. Meadors was claiming
2  a brain injury?
3      A.   So we knew that he was -- was in a case
4  where there was an indication of head trauma, yes.
5  But, again, all of the -- all of the analyses that
6  go into this report are all computer-automated. So
7  the only thing that the computer knows is that he is
8  a 41-year-old -- or 42-year-old male and, so,
9  whether he's had a head trauma, whether he has
10 nothing, the computer doesn't know anything about
11 that. None of that go goes into the generation of
12 these types of -- of graphs, yet -- all of that is
13 part of the second question not the first question.
14     Q.   Okay. As far as the -- the volumetric
15 findings goes, is there -- is there any significance
16 to the findings once they've been corrected for
17 false positives, and whatnot?
18     A.   No, there's no statistically significant
19 abnormalities, and there's not a pattern that gives
20 me -- you can, sometimes, have things that aren't --
21 do not survive statistical significance but still
22 may have newer biological significance. I don't
23 feel that that is the case here. The volumetric
24 information just did not reveal any clear
25 abnormalities here.

Page 37

1      I will point out that we get evidence of
2  clear abnormalities in only about 50% of individuals
3  with mild traumatic brain injury. So not having
4  abnormalities doesn't -- is not an indication that
5  there's no trauma, it's just -- it's kind of a wash.
6  It doesn't inform us at all.
7      Q.   Say that again, I'm sorry.
8      A.   So -- so, because 50% of people, who we
9  have very good indications have traumatic brain
10 injuries, are still normal on volumetrics, a
11 negative finding does not mean that someone does not
12 have head trauma.
13     Q.   Okay. Let's see. And we talked,
14 earlier -- just to be clear, you're not presenting a
15 diagnosis in this case, correct?
16     A.   That is correct.
17     Q.   And that's something that a doctor does?
18     A.   Yes, sir.
19     Q.   And, in fact, in your report, you mention
20 "All opinions reported herein are from a
21 neuroscientific perspective." Is that -- is that as
22 opposed to a medical perspective?
23     A.   Yes, sir.
24     Q.   And what does a "neuroscientific
25 perspective" mean, as opposed to a "medical



Page 38

1  perspective," in your opinion?
2      A.   A neuroscientific perspective is something
3  I do as a brain scientist who has special training
4  and expertise in the evaluation of traumatic brain
5  injury.  A medical opinion is for purposes of
6  patient care.  And, so, what I'm saying, in and of
7  itself, as a neuroscientist, is not information to
8  be used to guide medical care.
9      Q.   So you have no opinion of future treatment
10  or care of Mr. Meadors?
11      A.   So -- so, from a neuroscientific
12  perspective, if I am asked the question, "Are things
13  likely to get better?", there's neuroscientific data
14  that address that and whether someone will have
15  recovery of function, long-term, but, again, not
16  doing that from a medical perspective.
17      Q.   Are you doing that, in this case, from a
18  neuroscience --
19      A.   I have not been asked to do that from
20  neuroscientific perspective in this case.
21      Q.   Are there any -- is there any support in
22  the literature for reliance on DTI as a predictor of
23  patient outcomes?
24      A.   So, again, not DTI in isolation.  Within
25  the context of more severe traumatic brain injury,

Page 39

1  especially low FA values have been associated with
2  poor outcomes.
3      Q.   Okay.
4      A.   I'm not sure if that fully answered
5  your -- your question.
6      Q.   Is -- is there -- I mean, is that a
7  study -- peer-review type of deal -- or is that
8  just, kind of, based on your experience?
9      A.   I don't know if I can point to any
10  specific studies on the DTI.
11      Q.   And we talk about lower patient outcomes.
12  What are "patient outcomes" in that specific
13  instance?
14      A.   So, quality of life, return to work, those
15  types of things.
16      Q.   Okay.
17      A.   So there's been a lot more of that done
18  with volumetric findings than DTI, per se.
19      Q.   Okay.  And do you know if any doctor has
20  disabled Mr. Meadors from working, from a
21  neuropsychological or neurological perspective?
22      MR. WOOD:  Objection to form.  I've
23  actually made a couple of objections, can everybody
24  hear me?
25      MR. GAUDET:  We can now --

Page 40

1      MR. WOOD:  I don't know where you couldn't
2  hear me.  I've made maybe four or five.
3      MR. GAUDET:  Why don't we just note, for
4  the record, that we'll reserve objections.  Is that
5  okay?  I mean --
6      MR. WOOD:  That's okay.
7      MR. GAUDET:  You go ahead and keep making
8  them, I don't want to deprive you of making your
9  objection.  Sorry about that, we've got the volume
10  up, I think, as far as it will go at this point.
11      Q.   (By Mr. Gaudet) So I'll represent to you
12  that Mr. Meadors also suffered from injuries
13  orthopaedic in nature, such as a neck, back,
14  shoulder type of stuff.  He's had a procedure on
15  his -- at least one of his knees; in, I think, now,
16  both of his shoulders.  So I'm drawing a distinction
17  between being disabled from employment from a
18  physical perspective, versus a mental or
19  psychological perspective.  So the question is:  Are
20  you aware of any opinion saying that Mr. Meadors
21  cannot work from a psychological or neurological
22  perspective?
23      A.   I am not aware.
24      MR. WOOD:  Object to form.
25      A.   So I have not seen any report specifically

Page 41

1  stating, one way or another, in terms of
2  neuropsychological function, being able to return to
3  work.
4      Q.   Okay.  So your report indicates that
5  there -- you talk, a little bit, about some false
6  positives and the Benjamini-Hochberg correction for
7  multiple comparisons with false discovery rate of
8  25%.  Could you just describe -- give us an idea of
9  what you did to correct for any potential false
10  positives.
11      A.   Yeah.  So -- so, when you do lots and lots
12  of tests, even a neurotypical individual, there's an
13  expectation that they will have some individual
14  tests that show up outside of the normative range.
15  And, so, the Benjamini-Hochberg procedure is a
16  particular way of dealing with that.
17      And, basically, what it is saying is that
18  we're going to accept the possibility that one of
19  every four findings might be a false positive.  And,
20  so, we do -- it's -- it's two levels.  So the
21  individual tract has to be statistically abnormal
22  at -- with only a 5% probability of false positive.
23  And then we look and correct the whole dataset with
24  this Benjamini-Hochberg procedure.
25      And, so, for the -- so, if you look at the



EXHIBIT F

Page 42

```
 1   volumetrics, for example, there are a couple of red
 2   and blue areas noted, but Benjamini-Hochberg says
 3   you could get that just by chance, so we're not
 4   going to take any of those as significant.  For the
 5   DTI values, what the Benjamini-Hochberg says is that
 6   all 11 of the indicated tracts are, more likely than
 7   not, true findings, there's a possibility that one
 8   out of every four of those is a false positive.  So
 9   we have 11 tracts that are identified as abnormal,
10   there might be two, or three, in there that are
11   false positives, but the other nine are true
12   findings.
13      Q.   Okay.  What's the basis of the false
14   discovery rate of 25% as opposed to some other
15   percent?
16      A.   So -- so different people use different
17   things.  When you have, like, thousands and
18   thousands of comparisons, the recommendation is to
19   set that very, very high.  When you have relatively
20   few comparisons -- and a hundred is actually
21   considered relatively few in this type of domain --
22   a 25% rate is what's typically used.
23      Q.   Okay.  And the Benjamini-Hochberg
24   correction is -- is relied upon in your field of
25   neuroscience?
```

Page 43

```
 1      A.   Yes, sir.
 2      Q.   Okay.  You note that the high FA values
 3   are -- are commonly seen during the subacute phase
 4   of a traumatic brain injury, so we're talking less
 5   than six months?
 6      A.   Yes, sir.
 7      Q.   But they can extend into the chronic
 8   stage, which is more than six months?
 9      A.   Yes, sir.
10      Q.   So, at this point, when I say "this
11   point," at the point that your report was drafted,
12   we were, what, five months out, October to March?
13      A.   Yeah, so about five -- five months out.
14   So he was kind of in that transition period -- was
15   his accident in 2018 or 2019?
16      Q.   2018.
17      A.   So he's kind of at that transition phase
18   between subacute and acute.  Again, we -- we have
19   now seen individuals very far into the chronic
20   period that are still showing high FAs and that's
21   been reported, now, in one of the large Department
22   of Defense studies.  So the very -- so the earlier
23   work, if you divided subacute versus acute periods,
24   the highs tended to be more in the subacute, excuse
25   me, than the chronic period, but it's now very clear
```

Page 44

```
 1   that you can have highs extend into the chronic
 2   period.
 3      Q.   Would it be important to do a follow-up
 4   DTI MRI of this gentleman now that it's been over a
 5   year since the accident?
 6      A.   Important in what sense?
 7      Q.   Well, in clarifying your findings, I
 8   suppose.
 9      A.   It -- it -- there might be utility in
10   doing a follow-up.  Again, sometimes, things change
11   from high to lows over the time course of things.
12   Again, what we have -- you know, all I have, at this
13   point, is this one scan.
14      Q.   Right.  If -- you know, hypothetically, if
15   you -- if he did a scan again -- DTI -- and those
16   high values were -- were within lower, or in the
17   normal range, does that correlate with recovery
18   from -- from an injury?
19      A.   So -- so, if a new scan were done and
20   everything was within the normative range, that
21   would suggest that there's been some functional
22   recovery, yes -- or structural recovery.
23      Q.   Okay.  We'll talk about the functional
24   issues.  And, again, a DTI is a structural view of
25   the brain, or how it's working, and not necessarily
```

Page 45

```
 1   functional, correct?
 2      A.   Correct.
 3      Q.   All right.  Page 3, under "Impressions and
 4   Conclusions" -- impression and conclusions, you note
 5   in -- you're talking about the volumetric analysis
 6   and you say "in considering these observations, it
 7   is important to note that the sensitivity of even
 8   quantitative volumetric assessment to mild TBI is
 9   only about 60%, even in the chronic period."  What
10   does "sensitivity" mean in that sentence?
11      A.   So "sensitivity" is the probability that
12   you'll have an abnormal finding.  And, so, again --
13   so what we're saying here is that even in people
14   that we have very strong evidence have actual
15   traumatic brain injury, this type of evaluation only
16   shows abnormalities in 60% of them.  In fact, our
17   more recent data have actually pulled that down a
18   little bit closer to 50%.  So what this statement is
19   simply saying is that the fact that we're not seeing
20   anything, it doesn't support the presence of TBI,
21   but we also know that 40 to 50% of people don't show
22   anything here, so it's not a test to exclude TBI.
23      Q.   Okay.  And is there a similar sensitivity
24   for the DTI --
25      A.   Yes.
```

MAGNA
LEGAL SERVICES

EXHIBIT F

Page 46

1     Q.   -- as opposed to the volumetrics?
2     A.   Yes.  And that, too, is about 60%.
3     Q.   Okay.  Okay.  So, again, hypothetically,
4  say the DTI showed everything was within normal
5  range, that is saying that the fact that you don't
6  see anything abnormal doesn't mean that there's no
7  TBI?
8     A.   Correct.  It doesn't support that there is
9  TBI, but it doesn't mean that there is not TBI.  We
10  just -- these techniques have limited sensitivity
11  for identifying brain damage.
12     Q.   Okay.  And does that sensitivity apply
13  over a group setting, as opposed to an individual
14  analysis?  Does that make sense?
15     A.   So the number comes from a group
16  analysis --
17     Q.   Okay.
18     A.   -- yes.
19     Q.   Is there any study showing sensitivity
20  analysis on -- on individuals, if that question make
21  sense.  In other words -- I'm not sure how to -- how
22  to ask that question.
23     A.   So, again -- so the sensitivity number is
24  the same, it's -- it's -- you derive it from a
25  group, but it's based on looking at the individuals

Page 47

1  within the group.
2     Q.   Right.
3     A.   So, again -- so what the literature
4  indicates, is that you will see abnormalities in
5  about 50 to 60% of individual subjects.
6     Q.   Okay.  And, so, if you have hundred
7  subjects, you can't just -- there's no way to pull
8  out one and say, "Well, this one is showing no signs
9  on DTI but has a traumatic brain injury"?
10     MR. WOOD:  Object to form.
11     A.   I'm not certain I understood the -- the
12  question.
13     Q.   (By Mr. Gaudet) You can't look at
14  Mr. Meadors' volumetric analysis, even using the
15  60% -- that 60% correction rate, or whatever you
16  want to call it, and draw that conclusion in his
17  individual case?
18     A.   So, no.  So -- so, in the individual case,
19  again, for the DTI, I can very strongly say this is
20  abnormal.  So -- so the -- the confidence that this
21  is abnormal is based on the statistics, and it's
22  very high that this is abnormal.
23     Q.   That's the first question, and it's also
24  based on the control sets and --
25     A.   Right.  Causality is a different question,

Page 48

1  and you can't do that with the DTI alone.
2     Q.   Right.  Okay.  You can't just take just
3  the DTI and find out the cause of the findings on
4  the DTI itself?
5     A.   Correct.
6     Q.   You need other information?
7     A.   Other information.  Most importantly,
8  historical information.
9     Q.   Okay.  And other information might include
10  family history of neurological disorders, such as,
11  you know, multiple sclerosis, or even dyslexia,
12  history of substance abuse, prior traumas?
13     A.   Family history plays -- would play a very
14  limited role here.  Again, in -- in -- his
15  individual history would be the -- the critical
16  issue.
17     Q.   Okay.  Got you.  Okay.  All right.  You
18  talk about the abnormal fiber tracts -- 11 in
19  particular -- which normally support a ridge of
20  visual, auditory, motor, and cognitive functions.
21     A.   Yes, sir.
22     Q.   Including memory and emotional process?
23     A.   Yes, sir.
24     Q.   So what that means is that the DTI kind of
25  carves up the brain into 48 different tracts,

Page 49

1  correct?
2     A.   Yes, sir.
3     Q.   And those tracts are associated with some
4  sort of functionality?
5     A.   Yes, sir.
6     Q.   Are there studies that give more of a, you
7  know, correlative relationship between the tracts
8  and the function, or is that a causation --
9  something that we know that, "This area of the
10  brain" --
11     MR. WOOD:  Object.
12     MR. GAUDET:  Say again, Zach.
13     MR. WOOD:  I'm going to make another form
14  objection.
15     Q.   (By Mr. Gaudet) Okay.
16     A.   So -- so there's very good neuroscientific
17  data showing the relationship between functions and
18  which parts of the -- of the brain support those
19  functions, what tracts are critical for those
20  functions.
21     Q.   Okay.  And is that -- those peer-reviewed
22  studies?
23     A.   Yes.
24     Q.   Typically relied upon in your field?
25     A.   Yes, sir.



EXHIBIT F

Page 50

1    Q.    Mine's not in color, so bear with me, but
2  I think it's, you know, darkened, basically.  So
3  the -- the Brodmann areas are the -- 48
4  individual tracts?
5    A.    So the Brodmann areas are the volumetrics.
6    Q.    Okay.
7    A.    And, so -- so they're kind of the
8  processing modules, and, then, there's the 48 white
9  matter tracts.
10    Q.    Table 2 is what I need to be looking at?
11    A.    Yes.
12    Q.    So, as a for instance --
13    A.    So, actually, table 3 is the more
14  useful --
15    Q.    Okay.
16    A.    -- one.
17    Q.    What's the difference between the two
18  tables?
19    A.    So table 2 has the actual FA values.
20  Table 3 is a description of the connections and the
21  functions.
22    Q.    Got you.  Okay.  So the pontine crossing
23  tracts, for example --
24    A.    Yes.
25    Q.    -- those connect the pons, which is the

Page 51

1  area of the brain to the contralateral cerebellum?
2    A.    Correct.
3    Q.    And those are associated with the
4  coordination of movement?
5    A.    Yes.
6    Q.    So, motor?
7    A.    Motor function, yes.
8    Q.    Okay.  So the -- what does the abnormally
9  high FA value in that particular brain region
10  indicate as far as functionality, in your opinion?
11    A.    So -- so, again, the -- the links are
12  general.  So the high FA value in that particular
13  set of tracts could be a sign of pathology.  Let me
14  just see what the values are.  So his values in that
15  particular tract are only -- they're statistically
16  high, so it could be a sign of pathology.
17        At this lowest level, it could be enhanced
18  functioning.  So, if you told me that, you know, he
19  were a basketball player who had great motor skills,
20  for that particular tract, that could be the cause
21  of this, as opposed to pathology -- because the
22  value is so low there.  But it might be pathology.
23  And one would anticipate some deficits in fine motor
24  skills.
25    Q.    Okay.  And just so everybody's clear, when

Page 52

1  you say "pathology," what -- what do you mean?
2    A.    So, injury.
3    Q.    Injury.  Okay.  So that -- that finding
4  is -- suggests some injury to the brain --
5    A.    Yes, sir.
6    Q.    -- which correlates to some deficit in
7  functionality of movement?
8    A.    In fine motor skills, yes.  Coordination
9  of motor skills.
10    Q.    Suppose someone had a bad injury to his
11  arm and couldn't use his arm that much, is there
12  any -- was there an impact in that particular area
13  of the brain from lack of use of the limb, as
14  opposed to -- in other words, does it go both ways?
15    A.    So -- yes.  So the data on that are still
16  emerging.  The expectation would be a low FA value
17  from disuse of something.  Can I rule out, 100%
18  certainty, you might not get a high FA value?  No.
19    Q.    And, then, the high FA values on that
20  particular tract, concerning coordination and
21  movement, that doesn't mean that Mr. Meadors can't
22  walk or brush his teeth or turn a screwdriver?
23    A.    No, sir.
24    Q.    And is there any way to give a -- like a
25  rating to the deficit of movement caused by that

Page 53

1  value?
2    A.    So -- so, again, certainly, not from
3  this -- this alone.  If one did motor function -- a
4  set -- so neuropsych -- part of a neuropsych battery
5  or the physical battery, one could get a value of
6  the actual motor capabilities.  But from the DTI
7  alone -- and my expectation here would be a minor --
8  a minor deficit in motor function.
9    Q.    And suppose Mr. Meadors had done some
10  pegboard deals with his neuropsych exam, and suppose
11  that he didn't perform very well on those.  Is there
12  any way to distinguish between orthopaedic injuries
13  causing those fine motor issues versus abnormally
14  high FA values?
15    A.    Not with any confidence.  If there's
16  orthopaedic injuries, that could certainly be
17  contributing to that particular finding.
18    Q.    Okay.  And, then, the next one -- and,
19  again, mine's not in color -- the next one looks
20  like it's the fornix -- F-O-R-N-I-X?
21    A.    Yes, sir.
22    Q.    And that is correlated with short-term
23  memory functionality?
24    A.    Yes, sir.
25    Q.    And, again, these -- do these high FA



EXHIBIT F

Page 54

1    values suggest a deficit in short-term memory?
2        A.    Again, based on these high FA values, from
3    a neuroscientific perspective, one would anticipate
4    that there's a short-term memory deficit, and you
5    have to do the formal neuropsychological testing and
6    correlate it with this to round out the -- story
7    there.
8        Q.    Okay.  When you issued your report, had
9    you already reviewed the records of Andrews and
10   Foundas?
11       A.    No, I did not have those records at the
12   time the report was made.
13       Q.    Can I see yours, it's in color.  So I just
14   don't have a -- one that's in color.  The two we
15   just talked about are in kind of like a peach
16   highlight, I guess, and, then, others are in pink?
17       A.    Well, that's actually a problem from
18   printer.
19       Q.    That's all supposed to be --
20       A.    They're all the same color.  So -- so this
21   chart doesn't distinguish the severity.  You have to
22   refer back to this one to get the severity.
23       Q.    Okay.  You're referring to figure 2?
24       A.    Yes, sir.
25       Q.    Okay.  And the pink only means that

Page 55

1    they're abnormally high?
2        A.    Yes, sir.
3        Q.    And if they were abnormally low, they
4    would be in blue, it looks like?
5        A.    Correct.
6        Q.    Okay.  So if we look at figure 2 -- okay.
7    So figure 2 -- if we can both look at it, I think
8    it's easier since mine's not in color -- the tract
9    regions where the bar is red has abnormally high FA
10   values, and we know, in this case, there are no
11   abnormally low FA values, you know -- again, I guess
12   this is a problem with the printer?
13       A.    So -- so -- no, this one is color-coded.
14   The printer did something a little bit funny to make
15   those more reddish than orange, but -- so this is
16   the more severe.  So you can also tell by height of
17   the bar.  So this is a very, very severe finding.
18       Q.    In the fornix?
19       A.    In the fornix, as opposed to some of these
20   other findings, which are the lowest level of
21   statistical certainty.
22       Q.    What does "left" and "right" refer to?
23       A.    So -- so the first six tracts are along
24   the midline, but, then, there's a separate corona
25   radiata in the right hemisphere and left hemisphere,

Page 56

1    so it's referring to the hemisphere.
2        Q.    What is the corona whatever-you-said?
3        A.    That has sections between the thalamus and
4    different brain areas.  So there's anterior,
5    posterior -- there's segments there.
6        Q.    Okay.  And the brain is, roughly,
7    symmetrical?
8        A.    It is structurally, roughly, symmetrical.
9    There's actually quite a bit of functional
10   specialization.  Left hemisphere, more involved in
11   language functions.  Right hemisphere, more involved
12   in spacial types of functions.
13       Q.    Okay.  And is that why most of these are,
14   you know, not the same, left and right?
15       A.    They may not be the same, left and right,
16   yes.
17       Q.    And just for the record, your report, you
18   talked about David Sylvestri -- he did sign off
19   on -- he reviewed the volumetric DTI analysis and
20   accepted the final DTI and volumetric Z-scores as
21   statistically appropriate?
22       A.    Yes.
23       Q.    And, then, Dr. Soll, supervised the data
24   acquisition for the DTI, confirmed MRI protocols
25   were methodologically sound, and then accepted the

Page 57

1    scores as statistically appropriate?
2        A.    Yes, sir.
3        Q.    Okay.  Under the impression and conclusion
4    section of your report, your last paragraph, you
5    note that "The abnormal DTI observations for
6    Mr. Meadors could be the result of a mild traumatic
7    brain injury."  How do you define "mild traumatic
8    brain injury"?
9        A.    So "mild traumatic brain injury" is really
10   defined by what the GCS is at the scene, whether
11   there's post-traumatic amnesia, whether there's loss
12   of consciousness, and so -- so -- so mild traumatic
13   brain injury is classification, not a diagnosis.
14   There are a couple of other schemes that are out
15   there, but this profile is most consistent with a
16   mild type of TBI.
17       Q.    Okay.  So you distinguish between a
18   classification as opposed to diagnosis.  Unpack that
19   a little bit.  What's a "classification"?
20       A.    So -- so mild, moderate, severe TBI is a
21   classification.  A diagnosis of things, like major
22   neurocognitive impairment, because of, TBI is a
23   diagnosis.
24       Q.    But TBI is not a diagnosis, in your
25   opinion?

MAGNA
LEGAL SERVICES

EXHIBIT F

Page 58

1    A.   TBI itself is actually not -- there's not
2  a diagnostic code that's for mild TBI versus
3  moderate versus severe.  And, again, I'm not doing a
4  diagnosis, I'm looking at things from a
5  neuroscientific perspective.
6    Q.   Okay.  And, earlier, I believe you said
7  that a DTI, standing alone, doesn't necessarily show
8  you the presence of a traumatic brain injury?
9    A.   Correct.
10    Q.   Okay.  So you say it could be the
11 result -- and we talked, earlier, about the history
12 of the patient, in particular, is what's needed for
13 a more global assessment --
14    A.   Correct.
15    Q.   -- and a diagnosis, maybe from a different
16 provider, not yourself?
17    A.   Yes.
18    Q.   You clarify, later on, that "careful
19 review of these findings" -- the imaging findings --
20 so the DTI findings -- "in the context of
21 Mr. Meadors' developmental profile, medical history,
22 timeline of symptom development, and additional
23 radiological neurological, neuropsychological,
24 and/or psychiatric evaluations is needed to further
25 clarify the etiology of his current clinical

Page 59

1  status," and you can't render that opinion, correct?
2    A.   I do not have that additional information
3  at this point.
4    Q.   Okay.  And as far as --
5    A.   But -- I'm sorry.  So, if I had all that
6  information, I could render an opinion on that from
7  a neuroscientific perspective.
8    Q.   And "that," you mean etiology of --
9    A.   Yes.
10    Q.   -- the TBI from a neuro-- so it says
11 "clinical status," though, so "etiology of his
12 current clinical status."  Now, that's more of a
13 doctor's -- a medical doctor's --
14    A.   Yes.  Yes.  So I would do it for the
15 neurobiological status.
16    Q.   What's the basis for having a DTI be even
17 a part of the -- what you view as, you know, the
18 information you're making up of potential TBI
19 diagnosis?
20    A.   So, DTI, despite its limited sensitivity,
21 is one of the most sensitive tests that we have to
22 axonal damage.  And, so, in some cases --
23 neuropsychological testing, for example --
24 individuals do poorly on their validity markers and,
25 so, having imaging data can provide you a much more

Page 60

1  objective view of whether or not there's damage or
2  not.
3    So DTI is, potentially, quite useful as
4  part of this overall profile.  Again, in and of
5  itself, it is not adequate.
6    Q.   Okay.  Earlier, we talked about -- we
7  talked about the fiber tract that is associated with
8  the coordination of movement in fine motor skills,
9  and I asked if a person with -- with orthopaedic
10 injuries -- the example, I believe, was a
11 pegboard -- you said you can't reliably distinguish
12 what's causing those problems on the pegboard test,
13 whether it's orthopaedic in nature versus the damage
14 to the fiber tract?
15    A.   So, again, I do not believe that you can.
16 That particular test is really part of something
17 that a neuropsychologist does.  A neuropsychologist
18 might have sufficient expertise to make that
19 distinction, I don't have that expertise.
20    So -- so, if you told me that there were
21 problems on the pegboard test and there were
22 orthopaedic injuries, can I ascribe those problems
23 to the DTI and not to the orthopaedics?  I cannot
24 make that distinction.
25    Q.   What about for the second area of the

Page 61

1  fornix, which is associated with short-term memory?
2  Can you -- can you distinguish between the high FA
3  values causing problems with short-term memory
4  versus some other cause, whether it be past trauma,
5  drug use, or something that a patient is born with?
6    A.   So, again, certainly not based on the DTI
7  alone.  If I had all -- so, if you told me, for
8  example, that an individual client had a terrible
9  history of alcohol abuse, the patterns that we know
10 from the DTI and what that does to structures like
11 the fornix, based on the literature, are not
12 consistent with what we see here.  So it depends on
13 the actual details, on the extent to which I can
14 say, "Boy, I can't rule that out," or "that profile
15 really doesn't match."
16    Q.   And what about for the superior cerebellar
17 peduncles?
18    A.   The peduncles, they're a little bit more
19 in this pontine crossing tract type of range.  So,
20 again, it really depends on what the details are.
21    Q.   Okay.
22    A.   But, for example, the -- the peduncle is
23 actually one of the regions that's -- commonly is
24 impacted by head trauma --
25    Q.   Okay.



EXHIBIT F

Page 62

1    A.   -- especially in an
2  acceleration/deceleration type of accident, where
3  there's kind of a neck whiplash.  So -- but, again,
4  for each fiber tract, I need to know that history.
5  Some of them, I may say, "I can't rule that out."
6  Some of them, I can say, "This pattern is really
7  inconsistent."
8    Q.   Without going through all 11, would that
9  be the case for each of the abnormal fiber tracts?
10   A.   Yes.
11   Q.   So you can't look at the DTI for any of
12 these abnormal fiber tracts and say, "Well, you
13 know, the" -- "the" -- "this trauma," or -- "this
14 accident caused this impairment in functionality"?
15   A.   Not based on the DTI alone.
16   Q.   Is it possible to have a finding -- again,
17 let's -- let's go with the pontine crossing tracts,
18 just as an example.  Is it possible to have a
19 finding of abnormally high FA value that you would
20 associate with a deficit in fine motor skills that
21 has -- that doesn't show up in -- in, you know, real
22 life, I guess?
23   A.   Yes, sir.
24   Q.   Okay.  And would that be possible for the
25 remaining -- remaining 10 tracts of high FA values?

Page 63

1    A.   So it's always possible.  It becomes a
2  more-likely-than-not, in my opinion, and -- so we do
3  know that the brain can show functional
4  compensation.  That functional compensation can be
5  fragile, so, if there's underlying structural
6  abnormalities, you worry about, long-term, what's
7  going to happen with aging, what's going to happen
8  if there are other disease process, but -- but
9  individuals can show functional recovery.
10   Q.   Right.  Even if the -- the area that's
11 damaged doesn't necessarily heal, you're saying
12 other areas of the brain will compensate?
13   A.   Correct.
14   Q.   Is it possible to tell, more likely than
15 not, based on the basis of DTI, whether or not these
16 11 abnormally high FA value tracts were caused by
17 the accident?
18   A.   Again, not based on the DTI in isolation.
19   Q.   Okay.  And, again, you said, a bunch of
20 times, you need other information, background
21 history, et cetera, et cetera?
22   A.   Yes, sir.
23   Q.   In the instance where you do have a
24 patient with known comorbidities, how do you deal
25 with those -- how do you account for those?

Page 64

1    A.   So the -- the way to deal with -- the best
2  way to deal with the comorbidities is based on the
3  scientific literature, so what does the scientific
4  literature say are the expectations for patterns and
5  volumetrics, or DTI data.
6    Q.   Okay.  Are there any correlations between
7  DTI findings of high FA values in the particular --
8  let's go with the fornix, the short-term my memory.
9  Are there any correlations of high FA values and
10 performance on cognitive testing?
11   A.   Yes.  So most of the work that's out there
12 involves low FA values, but there -- there is some
13 work on high FA values.  I am not certain I could
14 point to anything specific on the fornix, per se.
15   Q.   Can you point to anything specific on the
16 other areas?
17   A.   So I'd have to check.  I think that the
18 superior frontal occipital fasciculus with high
19 values has some explicit things.  Again, the way
20 that I look at these are, both high and low are
21 dysfunctional.  So there's clearly work linking
22 these tracts to particular cognitive symptoms --
23 again, more of it is with low FA values because
24 that's what a more typical pattern -- but the idea
25 is, disruption of this tract is related to these

Page 65

1  cognitive functions, and that is available for all
2  of these tracts.
3    Q.   Okay.  Are you capable of rendering an
4  opinion on that correlation, or maybe a causation,
5  or is that like a neuropsychological doctor?
6    A.   So I'm certainly capable of rendering an
7  opinion on the relationship between what brain
8  functions are supported by these tracts.  I am not
9  the person to make the statement that "This testing
10 was done, shows a memory deficit."  That would be in
11 the realm of a neuropsychologist.  I could -- I am
12 capable of, then, relying on the neuropsychological
13 data to say that, "Yes, that's consistent with the
14 expected neuroscientific relationships."
15   Q.   What do you consider to be symptoms of
16 traumatic brain injury?
17   A.   So symptoms of traumatic brain injury fall
18 into three general categories.  They're what we call
19 somatic symptoms, so headache, pain, balance,
20 fatigue, poor sleep, basic sensory disturbances;
21 psychiatric symptoms, so depression, anxiety,
22 post-traumatic stress disorder, and certain
23 behavioral disruptions; and, then, cognitive
24 symptoms, things like memory, attention, executive
25 functioning.  And you will find individuals who are



MAGNA
LEGAL SERVICES

EXHIBIT F

Page 66

1   pretty good in one of those domains and bad in the
2   other two, or that there are individuals are bad
3   across the domains.
4       Q.   And, so, as far as correlations between a
5   DTI finding and the symptoms, if a patient is having
6   memory or attention deficit problems, is that
7   something that you could look to your report and
8   say, well, the fornix is showing high abnormal FA
9   values and that could be -- that could explain the
10  symptom?
11      A.   Yeah.  So -- so we have a better
12  understanding of the relationship between cognitive
13  factors and the specific fiber tracts.  We have some
14  understanding for psychiatric symptoms and certain
15  fiber tracts.  We have very poor understanding of
16  the somatic.  So the somatic stuff, it's not like
17  this fiber tract causes headaches, those
18  relationships don't exist.
19      Q.   And how do you tease out something such
20  as -- you know, lots of things can cause people to
21  have depression, right, just problem -- personal
22  problems and, maybe, family history, and things of
23  that nature, and, then, it sounds like there's some
24  correlation between certain fiber tracts and
25  something that could cause depression.  Is there a

Page 67

1   way to tell, more likely than not, that the
2   abnormally high FA values are causing something such
3   as depression, versus other factors in a person's
4   life?
5       A.   So we need to -- first, we need to make a
6   distinction between depressive symptoms and a
7   diagnosis of major depressive disorder, because
8   there's a wide range of severity there.
9       Q.   Sure.
10      A.   And severity, potentially, matters.  So
11  there are certain fiber tracts and brain regions
12  that show abnormalities in individuals with what we
13  call "idiopathic depression," so depression not
14  related to a traumatic brain injury.  The vast
15  majority of findings there are for low FA values in
16  those regions.
17          So, if I were to see someone with high FA
18  values in regions that have been linked to
19  depression, the data would suggest that that, more
20  likely, is related to something like a traumatic
21  brain injury versus an idiopathic.  If I had
22  somebody with low values, I might not be able to
23  tell.
24      Q.   Okay.
25      A.   But, again, from -- from the history, it's

Page 68

1   important to talk about, is the depression something
2   that happened post-traumatic, because I view
3   depression has a biological basis.  So it can,
4   certainly, be part of a brain damage, it's not --
5   there's a tendency to kind of link the cognitive
6   stuff to brain damage, and not the somatic, in the
7   psychiatric, and I disagree with that viewpoint.
8   The depression can, clearly, be a consequence of
9   actual brain damage.
10      Q.   And is that on the basis of studies --
11  peer-reviewed studies, and things of that nature?
12      A.   Yes, sir.
13      Q.   And if requested, could you provide those
14  studies and --
15      A.   Yes, sir.
16      Q.   Can you look at a DTI and say whether or
17  not the particular findings are of an acute nature,
18  and does acute -- is acute always defined as
19  traumatic?
20      A.   So I'm not sure I fully understand.  So we
21  can talk, in traumatic brain injury, about acute,
22  subacute, and chronic phases.
23      Q.   Sure.
24      A.   There are, certainly, things that can
25  happen to an individual, unrelated to TBI, that are

Page 69

1   acute that might give you some changes in DTI.
2       Q.   Let me rephrase.  That was a really bad
3   question because I think I asked it earlier.  You
4   can't look at a DTI and say this was caused by
5   trauma versus this was -- this was caused by, you
6   know, a build up of different things throughout a
7   person's life.  You can't look at the DTI alone?
8       A.   The DTI alone, that is correct.
9       Q.   Okay.  I think your report says that you
10  used standardized, objective, and automated
11  procedures?
12      A.   Yes.
13      Q.   What does that mean?  Those are three
14  different procedures, it sounds like.
15      A.   No.  No.  So, basically, there is -- so
16  the -- the first thing that you have to do, when you
17  get the data, is, you actually calculate the FA
18  values.
19      Q.   Okay.
20      A.   And we have a -- you calculate the FA
21  values, you do a statistical comparison with the
22  values from the normative database.  All of that is
23  an automated process.  It's automated, it's
24  objective.  The computer doesn't know anything about
25  the client, so your brain, my brain, all get



EXHIBIT F

Page 70

1  processed the exact same way.
2      Q.  Okay.
3      A.  So that's what that's referring to.  So
4  it's kind of the technical aspect of how did we get
5  these FA values.  So there are some people who, the
6  way that they get FA values is, they look at the
7  brain, they say, "Well, this looks like the corpus
8  colosseum to me, so I'm going to trace that."  And
9  then they do that for another brain.  But if they
10 knew that this was a TBI brain versus a control
11 brain, that could introduce bias into how well they
12 trace things.  So manual tracing has the potential
13 for bias.  Our procedures didn't have any of those
14 types of biases.
15     Q.  Okay.  So what's the computer program
16 called that does that?
17     A.  So -- well, so it's -- it's -- it's a
18 program that -- it's a pipeline that uses a number
19 of standardized pipelines.  So, for the DTI, the
20 main program is called FSL.  And then we use -- the
21 region of interest approach comes from the Johns
22 Hopkins.  So we have a program that links these
23 stages together.
24     Q.  Okay.
25     A.  And it's -- the exact same program was

Page 71

1  used to process all of the control subjects and
2  Mr. Meadors' data.
3      Q.  You anticipated my next question.
4  There's -- I guess it's related to table 1 -- that's
5  the volumetric -- I was going to ask, there's
6  "Scatter plots showing data from Mr. Meadors with
7  respect to 583 neurotypical male subjects."  Is that
8  only for the diametric analysis?
9      A.  Actually, that is the DTI.  That should
10 be -- and, so, I don't think anybody printed those
11 scatter plots.
12     Q.  I remember those from past.
13     A.  Right, so they'd have the individual
14 subjects and the -- the client values.
15     Q.  Do those 583 neurotypical male subjects
16 come from the same database?
17     A.  Yes.  So that -- so the 104 subjects are
18 the subset of those that are within the age range.
19 The 583 shows the full age profile.
20     Q.  What is astrogliosis?
21     A.  Astrogliosis --
22     Q.  A-S-T-R-O-G-L-I-O-S-I-S.
23     A.  Astrogliosis is when -- in certain types
24 of brain damage -- in particular, traumatic brain
25 injury -- there's two -- two major types of cells

Page 72

1  within the brain.  There's the neurons themselves,
2  and then there's the glial, which are the support
3  cells.  And when things get damaged, what often
4  happens, is the glia, basically, start to multiply.
5  So astrogliosis is, you get this kind of increase in
6  the number of glial and then some of them die off,
7  some of the neurons die off.  So it's part of the
8  injury mechanism.
9      Q.  And that can cause abnormally high FA
10 values?
11     A.  That can cause -- yeah, so what it does
12 is -- so, if the axons that are running together get
13 pushed together, that can cause high FA.  And, so,
14 one thing that can have that happen is, you get
15 astrogliosis over here, which takes up space and it
16 compresses things -- but it's a sign of damage.
17     Q.  And what can cause that particular --
18     A.  So trauma, stroke, are the two main ones
19 for setting off an astrogliotic reaction.
20     Q.  And what can cause the cytogenic edema?
21     A.  So cytogenic edema is -- you actually get
22 swelling from the inside, so the -- so the
23 individual axons swell up and compress.  That can
24 also be caused by trauma.  It could be caused by
25 stroke.  Those are the primary ones.

Page 73

1      Q.  Neuro-inflammation, same?
2      A.  Neuro-inflammation, right.
3  Neuro-inflammation is kind of the -- one of the big
4  candidates after traumatic brain injury, but you can
5  get neuro-inflammation in other conditions, as well.
6      Q.  Okay.  One of the factors that you list,
7  at the very end of your report, as part of, I think,
8  the more global factors in diagnosing, or finding, a
9  traumatic brain injury, is timeline of system [sic]
10 development.
11     A.  Symptom development.
12     Q.  Does that mean exactly what it sounds
13 like --
14     A.  Yes.
15     Q.  -- that the individual starts having this
16 symptom at X days or months after the accident,
17 or -- or hours?
18     A.  Yes.  So -- so one has to be a little bit
19 careful here because there's an impression out there
20 that symptoms are always worse immediately after the
21 injury.  The actual data do not support that.
22 Individuals have quite varying things.  And, so, you
23 can have individuals that are relatively -- or
24 aren't, at least, reporting symptoms until a couple
25 weeks out.  That does not bother me in TBI.  If it's



MAGNA ▶
LEGAL SERVICES

EXHIBIT F

Page 74

1    five -- if the first time somebody mentions a
2    problem in processing speed is five years after the
3    accident, that's not really consistent with the
4    expected timeline, unless you've got obvious
5    evidence of brain atrophy happening over that
6    period.  So -- so knowing the symptom profile can
7    tell you something about causality.
8        Q.   Okay.  And just to go back, real quick,
9    about the -- the neuro-inflammation -- and I'm
10   trying to find where it was -- astrogliosis -- can
11   you look at a DTI and tell if -- if a particular
12   individual has those -- those conditions -- from
13   looking at a DTI?
14       A.   So -- so some -- so, if it's severe, you
15   can see evidence of astrogliosis.  In a mild case,
16   typically, no.
17       Q.   And is that something that you need an
18   MRI, in general, to -- to see?
19       A.   Again, it's not very sensitive.  So,
20   again, in severe cases, you can look at the MRI and
21   see clear signs of gliosis.  It's not sensitive on
22   these mild cases.
23       Q.   Would that be the same for edema and the
24   inflammation?
25       A.   Yes.  So, again, when it's severe, you can

Page 75

1    see it on the MRI, but the sensitivity is low.
2        Q.   And looking at Mr. Meadors' MRI, is there
3    any indication he has any of those other
4    conditions -- even if there's some that we didn't
5    just talk about?
6        A.   So -- so, again, his structural MRI, my
7    recollection -- can I just see the doctor's report
8    for a minute.  Yeah, so my -- my recollection is
9    that, on gross visual inspection, his structural MRI
10   is within normal limits.
11       Q.   Would -- would there be any other
12   procedures, specifically imaging, that would help to
13   come at a causation opinion, or an etiology opinion,
14   such as an FMRI or CT scan, or things of that
15   nature?
16       A.   There are certain PET procedures that look
17   specifically at neuro-inflammation types of markers.
18   That could be done.  But, for the most part, no.
19   It's -- it's difficult with current imaging, in
20   particularly mild cases, to distinguish those --
21   those potential mechanisms down at the cellular
22   level.
23       Q.   And what about as far as drawing a
24   causation opinion between the tracts where there's
25   high FA values and functionality?  Would there be

Page 76

1    additional testing that could come at -- could give
2    us a better idea of whether or not the high FA
3    values were, in fact, causing symptoms in real life?
4        A.   Yes.  So neuropsychological testing would
5    help with that.
6            MR. GAUDET:  Okay.  I think that's all I
7    got right now.  Zach?
8            MR. WOOD:  You know, I don't have any
9    questions.  I think we're done here.
10           THE COURT REPORTER:  Read and sign?
11           THE WITNESS:  Yes.
12           THE COURT REPORTER:  Okay.  So can I,
13   please, get people's orders on the record, and how
14   they want it.
15           MR. GAUDET:  I'll go first, real quick.  I
16   filled out a little form.  The Defense would like a
17   regular condensed electronic copy only, if that's
18   possible.  I don't need -- I can just print it.  And
19   expedited whenever possible.  So, Zach, the question
20   would be, for a transcript order, do you all want
21   the regular, condensed, electronic copy only, rough
22   draft, or expedited?
23           MR. WOOD:  The regular condensed
24   electronic copy only is fine.
25           THE COURT REPORTER:  So where should I

Page 77

1    send the notice that it's ready to --
2            THE WITNESS:  I can get you a card.
3            MR. GAUDET:  All right.  We're talking
4    about attaching the current C.V.  Do you have any
5    objection to that?
6            MR. WOOD:  No.
7    (Note:  Deposition concluded at 11:56 a.m.)
8    (Note:  Exhibit 1 marked for identification.)

MAGNA
LEGAL SERVICES

EXHIBIT F

Page 78

1    LANCE MEADORS VS ANTONIA P. D'AGOSTINO, ET AL
2        DEPONENT SIGNATURE/CORRECTION PAGE
3        If there are any typographical errors to your
          deposition, indicate them below:
4
5    PAGE  LINE
6    _____ Change to _____
7    _____ Change to _____
8    _____ Change to _____
9    _____ Change to _____
10       Any other changes to your deposition are to be
          listed below with a statement as to the reason
11       for such change.
12   PAGE  LINE  CORRECTION      REASON FOR CHANGE
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20
21       I, JEFFREY LEWINE, do hereby certify that I
          have read the foregoing transcript of my testimony
22   on _____ and it is a true and correct
          record of my testimony given at that time, except as
23   to any corrections submitted.
24
     _____    _____
25   DATE SIGNED      JEFFREY LEWINE

Page 80

1        I FURTHER CERTIFY that the recoverable cost of
          the original and one copy of the deposition,
2    including exhibits, to PERRIER & LACOSTE, L.L.C. is
     $_____.
3
         I FURTHER CERTIFY that I did administer the
4    oath to the witness herein prior to the taking of
          this Deposition; that I did thereafter report in
5    stenographic shorthand the questions and answers set
          forth herein, and the foregoing is a true and
6    correct transcript of the proceeding had upon the
          taking of this Deposition to the best of my ability.
7
         I FURTHER CERTIFY that I am neither employed by
8    nor related to nor contracted with (unless excepted
          by the rules) any of the parties or attorneys in
9    this case, and that I have no interest whatsoever in
          the final disposition of this case in any court.
10
11
12       _____
13       KENDRA K. SUTTON, CSR, RPR
          RPR, CCR No. 131
14       License Expires: 12/31/2020
15
16
17
18
19
20
21
22
23
24
25

Page 79

1        UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF LOUISIANA
2
3
4    LANCE MEADORS,
5        PLAINTIFF,
6    -vs-          NO: 18-1007-BAJ-EWD
7    ANTONIO P. D'AGOSTINO, BUCHANAN
     HAULING AND RIGGING, INC., NATIONAL
8    INTERSTATE INSURANCE COMPANY AND XYZ
     INSURANCE COMPANY,
9
         DEFENDANTS.
10
11       CERTIFICATE OF DEPOSITION
12       I, KENDRA K. SUTTON, RPR, CCR #131, DO HEREBY
     CERTIFY that on FEBRUARY 28, 2020, the deposition of
13   DR. JEFFREY LEWINE was taken before me at the
     request of, and sealed original thereof retained by:
14
     PERRIER & LACOSTE, L.L.C.
15   One Canal Place
     365 Canal Street
16   Suite 2550
     New Orleans, Louisiana 70130
17   BY:  NATHAN M. GAUDET, ESQ.
18       I FURTHER CERTIFY that copies of this
     Certificate have been mailed or delivered to all
19   Counsel, and parties to the proceedings not
     represented by counsel, appearing at the taking of
20   the deposition.
21       I FURTHER CERTIFY that examination of this
     transcript and signature of the witness WAS
22   REQUESTED by the witness and all parties present.
     On _____, a letter was mailed or delivered to
23   THE WITNESS regarding obtaining signature of the
     witness, and any corrections, if any, were appended
24   to the original and each copy of the Deposition.
25



EXHIBIT F